**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ACER, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Case No. _____ |
| v. | § | |
| | § | |
| T-MOBILE USA, INC., T-MOBILE US, | § | |
| INC., AND SPRINT LLC F/K/A SPRINT | § | **JURY TRIAL DEMANDED** |
| CORP. | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

Plaintiff Acer, Inc. ("Acer") files this Original Complaint against Defendants T-Mobile USA Inc., T-Mobile US, Inc., and Sprint, LLC f/k/a Sprint Corp (collectively, "Defendants" or "T-Mobile") for patent infringement under 35 U.S.C. § 271. Plaintiff alleges, based on its own personal knowledge with respect to its own actions and based on information and belief with respect to all others' actions, as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement. T-Mobile has infringed and continues to infringe, contribute to the infringement of, and/or actively induce others to infringe United States Patent Nos. 8,737,333, 9,526,048, 9,999,097, 10,237,791, 11,044,053, and 11,252,641 (collectively, the "Asserted Patents").

2.      The Asserted Patents are Standard Essential Patents ("SEPs") that are fundamental to the implementation of widely adopted standards in wireless telecommunications, including Fourth Generation (4G), Long Term Evolution (LTE) and Fifth Generation (5G) standards.

3.      Acer has offered, and is prepared to grant, a license to the Asserted Patents to T-Mobile on terms and conditions that are fair, reasonable, and non-discriminatory. Acer brings this action because T-Mobile has refused such offers and has refused to negotiate in good faith towards a license on such terms. Instead, T-Mobile has continued to infringe the Asserted Patents without permission or license to do so.

## THE PARTIES

4.      Plaintiff Acer, Inc. is a corporation organized and existing under the laws of Taiwan, and is headquartered in Taipei, Taiwan.

5.      Defendant T-Mobile USA, Inc. is a Delaware corporation with a principal place of business at 12920 Southeast 38th Street, Bellevue, Washington 98006.

6.      Defendant T-Mobile US, Inc. is a Delaware corporation with a principal place of business at 12920 Southeast 38th Street, Bellevue, Washington 98006.

7.      Defendant Sprint LLC f/k/a Sprint Corp is a Delaware limited liability company with a principal place of business at 12920 Southeast 38th Street, Bellevue, Washington 98006.

8.      T-Mobile is doing business, either directly or acting through its agents or agent subsidiaries, on an ongoing basis in this judicial district and elsewhere in the United States, and has a regular and established place of business in this judicial district. T-Mobile can be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

10.     This Court has personal jurisdiction over T-Mobile because, among other things, T-Mobile has minimum contacts with Texas and this district such that this venue is a fair and

reasonable one. T-Mobile conducts substantial business in this forum, including (i) engaging in the infringing conduct alleged below and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Texas and in this district. This cause of action arises, at least in part, from T-Mobile's contacts with and activities in the Eastern District of Texas and the State of Texas.

11.     Venue in the Eastern District of Texas is proper under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

12.     T-Mobile has committed infringing acts in this judicial district by making, using, offering for sale, selling, or importing products or services that infringe the Asserted Patents (as defined above), or by inducing others to infringe the Asserted Patents. T-Mobile maintains a "regular and established" place of business in this district, including by (a) maintaining or controlling retail stores in this district, (b) maintaining and operating infringing base stations in this district, including on cellular towers and other installation sites owned or leased by them, and (c) maintaining and operating other places of business in this district, including those where research, development, or sales are conducted, where customer service is provided, or where repairs are made.

13.     T-Mobile has a regular and established physical presence in the district, including but not limited to, ownership of or control over property, inventory, or infrastructure. T-Mobile maintains a corporate office at 2250 Lakeside Boulevard, Richardson, Texas 75082, and maintains a Network Operations Center at 7668 Warren Parkway, Frisco, Texas 75034, both of which are located within this judicial district. T-Mobile's website (https://www.t-mobile.com/stores/locator) displays information for retail stores located at 1806 E. End Boulevard, Marshall, Texas 75670; 2004 St. Michael Dr., Texarkana, Texas 75503; 3741 Mall Dr., Texarkana, Texas 75501; 1400 W.

Southwest Loop 323, Suite 70, Tyler, Texas 75701; 8942 S Broadway Ave., Suite 104, Tyler, Texas 75703; and 3840 State Highway 64 W, Tyler, Texas 75704 (among others), all of which lie within this federal judicial district.

14.    T-Mobile is registered to do business in the State of Texas.

15.    In other recent actions, T-Mobile has either admitted or not contested that this federal judicial district is a proper venue for patent infringement actions against it. *See, e.g.*, Dkt. No. 39 (Answer) ¶ 21, *Pegasus Wireless Innovation LLC v. T-Mobile US, Inc. et al.*, No. 2:25-cv-289 (E.D. Tex. May 30, 2025); Dkt. No. 7 (Answer) ¶¶ 6–7, *Nodal Technologies LLC v. T-Mobile USA Inc., et al.*, No. 2:22-cv-176 (E.D. Tex. Aug. 1, 2022); Dkt. No. 8 (Answer) ¶¶ 13–25, *Solstice Wireless LLC v. T-Mobile USA Inc., et al.*, No. 4:22-cv-723 (E.D. Tex. Nov. 7, 2022); Dkt. No. 27 (Answer) ¶¶ 22–26, *Telecom Network Sols., LLC v. T-Mobile USA Inc., et al.*, No. 2:21-cv-418 (E.D. Tex. Jan. 18, 2022); Dkt. No. 65 (Answer) ¶ 13, ¶ 20, *IPCom Gmbh & Co. KG v. T-Mobile USA Inc., et al.*, No. 2:20-cv-321 (E.D. Tex. June 14, 2021). T-Mobile has also admitted or failed to contest that it has transacted business in this district. *See, e.g.*, *Solstice*, Answer ¶¶ 22–26; *Telecom*, Answer ¶¶ 8–23.

16.    T-Mobile derives benefits from its presence in this federal judicial district, including, but not limited to, sales revenue and serving customers using its mobile network in this district. For example, T-Mobile receives revenue from its corporate stores in this district, by selling network access, phones/products, and services, and by receiving payment for network access, phones/products, and services.

## THE ASSERTED PATENTS AND ACER'S GOOD-FAITH LICENSING ATTEMPTS

17.    U.S. Patent No. 8,737,333 titled "Method of Power Reporting and Communication Device Thereof" (the "'333 Patent") was duly and legally issued by the U.S. Patent and Trademark Office on May 27, 2014, after full and fair examination. Shiang-Jiun Lin and Chun-Yen Wang are

the named inventors listed on the '333 Patent. A true and correct copy of the '333 Patent is attached hereto as Exhibit 1.

18.     U.S. Patent No. 9,526,048 titled "Method of Handling Measurement Gap Configuration and Communication Device Thereof" (the "'048 Patent") was duly and legally issued by the U.S. Patent and Trademark Office on December 20, 2016, after full and fair examination. Shiang-Jiun Lin and Chun-Yen Wang are the named inventors listed on the '048 Patent. A true and correct copy of the '048 Patent is attached hereto as Exhibit 2.

19.     U.S. Patent No. 9,999,097 titled "Method of Radio Bearer Establishment in Dual Connectivity" (the "'097 Patent") was duly and legally issued by the U.S. Patent and Trademark Office on June 12, 2018, after full and fair examination. Wei-Chen Pao and Chun-Chia Chen are the named inventors listed on the '097 Patent. A true and correct copy of the '097 Patent is attached hereto as Exhibit 3.

20.     U.S. Patent No. 10,237,791 titled "Method of Updating Network Detection and Selection Information and Traffic Routing Information" (the "'791 Patent") was duly and legally issued by the U.S. Patent and Trademark Office on March 19, 2019, after full and fair examination. Wei-Chen Pao and Ching-Wen Cheng are the named inventors listed on the '791 Patent. A true and correct copy of the '791 Patent is attached hereto as Exhibit 4.

21.     U.S. Patent No. 11,044,053 titled "Device and Method of Handling Code Block Group-Based Communication Operation" (the "'053 Patent") was duly and legally issued by the U.S. Patent and Trademark Office on June 22, 2021, after full and fair examination. Chia-Wen Hsieh and Chien-Min Lee are the named inventors listed on the '053 Patent. A true and correct copy of the '053 Patent is attached hereto as Exhibit 5.

22.     U.S. Patent No. 11,252,641 titled "Method of System Information Transmission and Acquisition" (the "'641 Patent") was duly and legally issued by the U.S. Patent and Trademark Office on February 15, 2022, after full and fair examination. Ching-Wen Cheng and Hung-Chen Chen are the named inventors listed on the '641 Patent. A true and correct copy of the '641 Patent is attached hereto as Exhibit 6.

23.     Acer owns all rights, title, and interest in the Asserted Patents necessary to bring this action. Each of the Asserted Patents was assigned to Acer by their respective inventors.

24.     The Asserted Patents represent Acer's significant efforts and investments in the research and development of innovative technologies, as well as Acer's commitment to protect the intellectual property resulting from such innovations.

25.     The industry has recognized the benefits and value of these innovations, including the inventions embodied by the Asserted Patents, by adopting Acer's patented technology into widely adopted wireless telecommunication standards.

26.     Acer has declared the Asserted Patents essential to certain adopted wireless telecommunications standards that are managed by the Third Generation Partnership Project ("3GPP"). This declaration that the Asserted Patents are essential to certain standards comes with a commitment by Acer to license them to implementers on terms that are reasonable, and non-discriminatory.

27.     Acer has complied with this commitment. For example, Acer has negotiated with T-Mobile in a good faith effort to license Acer's 4G/LTE- and 5G- related SEPs, including the Asserted Patents. In connection with those efforts, Acer has engaged in numerous communications with representatives from T-Mobile as well as T-Mobile's equipment vendors throughout 2025. Illustrative of Acer's good-faith efforts to comply with its obligations as an SEP holder, during

those licensing negotiation communications, Acer provided T-Mobile and its representatives and agents with both evidence of use and a license offer based on terms that are reasonable and non-discriminatory.

28.    For example, Acer provided technical presentations which included claim charts that mapped certain representative Acer SEP patent claims, including exemplary claims from one or more of the Asserted Patents, to the applicable 3GPP cellular communication standards practiced by T-Mobile, such as the 4G/LTE and 5G Standards.

29.    In addition, Acer provided T-Mobile and its agents or representatives with license offers based on terms that were determined by Acer to be fair, reasonable, and non-discriminatory based on the industry information reasonably available to Acer at the time regarding royalty rates and infringing usage.

30.    Despite Acer's good-faith efforts, the Parties have been unable to reach an agreement due to T-Mobile's unwillingness to license Acer's SEPs, including the Asserted Patents, on fair, reasonable, and non-discriminatory terms.

31.    To the extent required, Acer has complied with any applicable constructive or actual notice requirements under 35 U.S.C. § 287 for recovery of pre-suit damages.

<u>THE ACCUSED INSTRUMENTALITIES</u>

**I.    The 3GPP Standards**

32.    The Third Generation Partnership Project ("3GPP") is an organization that maintains and develops globally applicable technical specifications for cellular telecommunications technologies, including the specifications for implementation and use of mobile wireless communications. The latest generations of such cellular communication standards have generally been referred to as the Fourth Generation ("4G") or Long-Term Evolution ("LTE") Standards and Fifth Generation ("5G") Standards. Organizational partners of 3GPP include

standard-development organizations from around the world, including (among others) the Alliance for Telecommunications Industry Solutions ("ATIS"), which represents North America in 3GPP, the European Telecommunications Standards Institute ("ETSI"), which represents Europe in 3GPP, and the Telecommunications Technology Association ("TTA"), which represents Korea in 3GPP.

33.    Implementation and use of the 4G/LTE and 5G Standards, including the use of wireless communications products and services compliant with the 4G/LTE and 5G specifications as detailed in various 3GPP technical specification series, have increased in recent years and continue to increase at a rapid pace.

34.    3GPP uses a system of "releases" to provide technical specifications which outline the 4G/LTE Standards and/or 5G Standards, including Releases 8–19, which outline the 4G/LTE Standards and/or 5G Standards. In North America, ATIS publishes the same standards with an ATIS cover page. Accordingly, references to 3GPP technical specifications in this Complaint should be understood to include the corresponding ATIS documents. Each new release may provide new or additional standardized functionalities compared to past releases. Release 8 was the basis for the deployment of the standard technology known as 4G/LTE. Subsequent updates or additions were incorporated into the 4G/LTE standards in later releases. Release 10 was the basis for the deployment of an updated version of 4G/LTE called LTE-Advanced ("LTE-A"). Releases 9, 11, 12, 13, and 14 included additional updates to the 4G/LTE and LTE-A standards.

35.    Release 15 introduced the first full set of 5G standards and was the basis for deploying the entire suite of 5G functionalities. Release 16 introduced additional 5G functionalities, including enhancements to many aspects of the 5G system, such as coverage, capacity, latency, power, mobility, reliability, and ease of deployment. Release 17 further enhanced

5G's technological foundations and broadened 5G's reach to new use cases, deployments, and network topologies. Release 18 represents the latest version called 5G-Advanced.

## II.    T-Mobile's Infringing Mobile Network and Instrumentalities

36.    T-Mobile operates and sells access to a mobile network that provides telecommunication, Internet, and other services to customers via cellular base stations located in this district and throughout the United States. T-Mobile's mobile network infrastructure relies on using technology and equipment, including said cellular base stations (collectively "Accused Instrumentalities") in a manner that infringes the Asserted Patents by operating in accordance with 3GPP 4G/LTE and 5G Standards, including Releases 8–15.

37.    T-Mobile's Accused Instrumentalities infringe the Asserted Patents by communicating with and/or using customers' mobile devices (also referred to as "terminals" or "user equipment"), such as mobile phones, smartphones, tablets, and mobile hotspots, in accordance with 4G/LTE and/or 5G mobile network standards.

38.    In public documents, T-Mobile states that it has a market-leading 4G/LTE and 5G mobile network, meaning that the network communicates in accordance with, at a minimum, 3GPP Releases 8–15, thereby infringing the Asserted Patents. For example, T-Mobile touts that it operates "America's Best Network" because it has "[t]he largest, fastest 5G towers and more bandwidth."[1] T-Mobile further boasts that "[w]hile our 5G network continues to expand, you can count on our 4G LTE network that connects 99% of Americans."[2]

---

[1] T-Mobile, *Compare Our 5G Network: Why Our Coverage Is Best*, https://www.t-mobile.com/coverage/network (last visited Jan. 6, 2026).
[2] T-Mobile, *T-Mobile Network*, https://www.t-mobile.com/support/coverage/t-mobile-network (last visited Jan. 6, 2026).

39.    T-Mobile further infringes the Asserted Patents on its website by encouraging prospective customers and visitors to use its 4G/LTE or 5G network, for example, by telling them to "Join T-Mobile" because it has "the largest, fastest, most advanced 5G network."[3]



40.    T-Mobile also uses its website to advertise the infringing methods of its mobile network to actual and potential U.S. customers. T-Mobile's website advertises mobile devices identified as supporting 4G/LTE and/or 5G, meaning that they communicate in accordance with, at a minimum, 3GPP Releases 8–15.

41.    T-Mobile states that substantial portions of its mobile network are 5G and 4G/LTE. In fact, T-Mobile provides a "5G & 4G LTE Coverage Map" on its website that identifies its 4G/LTE and 5G network coverage throughout the United States. Identified with T-Mobile's 4G/LTE or 5G coverage map are most locations in this judicial district.[4]

---

[3] T-Mobile, *Compare Our 5G Network: Why Our Coverage Is Best*, https://www.t-mobile.com/coverage/network (last visited Jan. 6, 2026).
[4] T-Mobile, *5G & 4G LTE Coverage Map*, https://www.t-mobile.com/coverage/coverage-map (last visited Jan. 6, 2026).



42.     T-Mobile's mobile network, including T-Mobile's base stations and user equipment, all operate in accordance with 4G/LTE and/or 5G Standards, including Releases 8–15, thereby infringing the Asserted Patents. For example, T-Mobile sells access to its base stations and mobile network to customers, including by advertising to customers that T-Mobile's network operates in accordance with 4G/LTE and 5G Standards.

43.     In the interest of providing detailed averments of infringement, Acer has identified below examples of at least one claim in each of the Asserted Patents for exemplary purposes to demonstrate infringement by T-Mobile's Accused Instrumentalities. However, the selection of claims should not be considered limiting, and additional claims of the Asserted Patents that are infringed by T-Mobile will be disclosed in compliance with the Court's schedule.

## COUNT I: INFRINGEMENT OF THE '333 PATENT

44.     Acer repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

45.     The '333 Patent generally relates to an apparatus and method for efficient Power Headroom (PH) management in a mobile network. '333 Patent at 1:50–2:33. PH is reported when

a mobile device sends information to a base station about the available headroom, or the difference between the actual maximum transmission power in a mobile device and the current estimated transmission power. *Id.* at 1:31–36. When accurate PH information is received from a mobile device, the network can better allocate radio resources and make efficient scheduling decisions. *Id.* at 1:36–38.

46.     The claims of the '333 Patent recite novel and inventive systems and methods for dynamic reporting of maximum output power, based on device-specific or network-related characteristics, thereby enabling better performance in mobile networks. The patented inventions overcome technical challenges in advanced wireless telecommunication networks, including for example, the problem of providing efficient power reporting in LTE-A networks that support carrier aggregation functionality (*e.g.*, the combination of multiple frequency bands for faster data) or parallel PUCCH and PUSCH transmission (*e.g.*, sending control signals and data at the same time on the uplink).

47.     Acer declared the '333 Patent as essential to certain 3GPP Standards, including Release 9 (and later) and its technical specifications, including but not limited to TS 36.321 and TS 36.101, which include inventions covered by the '333 Patent.

48.     T-Mobile has and continues, without authorization, to operate and use the Accused Instrumentalities in a manner that practices at least one claim of the '333 Patent literally or under the doctrine of equivalents. At a minimum, such Accused Instrumentalities include T-Mobile's mobile network, including cellular base stations and related telecommunication equipment configured to operate in accordance with 3GPP Standards at least as early as Release 9.

49.     By way of example, the Accused Instrumentalities infringe at least claim 17 of the '333 Patent, which recites:

17. A method of handling power reporting for a network in a wireless communication system, the method comprising:

configuring a plurality of uplink component carriers and/or parallel physical uplink control channel (PUCCH) and physical uplink shared channel (PUSCH) transmission to a mobile device of the wireless communication system;

providing information related to a maximum output power configuration for at least a uplink component carrier;

determining whether to start a maximum output power reporting for the at least a uplink component carrier in the mobile device according to a characteristic associated to the mobile device or the network; and

when the maximum output power reporting is started, determining whether to stop a maximum output power reporting for the at least a uplink component carrier in the mobile device according to a characteristic associated to the mobile device or the network.

50. The Accused Instrumentalities handle power reporting for a network in a wireless communication system, consistent with the requirements in 3GPP Standards. For example, Release 9's specifications provide procedures for power headroom reporting.[5]

---

### 5.4.6    Power Headroom Reporting

The Power Headroom reporting procedure is used to provide the serving eNB with information about the difference between the nominal UE maximum transmit power and the estimated power for UL-SCH transmission. The reporting period, delay and mapping of Power Headroom are defined in subclause 9.1.8 of [9]. RRC controls Power Headroom reporting by configuring the two timers *periodicPHR-Timer* and *prohibitPHR-Timer*, and by signalling *dl-PathlossChange* which sets the change in measured downlink pathloss to trigger a PHR [8].

---

51. The Accused Instrumentalities configure a plurality of uplink component carriers and/or parallel physical uplink control channel (PUCCH) and physical uplink shared channel (PUSCH) transmission to a mobile device of the wireless communication system. For example, base stations that comprise the Accused Instrumentalities use radio resource control (RRC) signaling to configure the uplink component carriers, as well as PUCCH and PUSCH.[6]

---

[5] *See, e.g.*, TS 36.321 (v. 9.3.0) § 5.4.6.
[6] *See, e.g.*, TS 36.300 (v. 10.1.0) § 7.5.

## 7.5    Carrier Aggregation

When CA is configured, the UE only has one RRC connection with the network. At RRC connection establishment/re-establishment/handover, one serving cell provides the NAS mobility information (e.g. TAI), and at RRC connection re-establishment/handover, one serving cell provides the security input. This cell is referred to as the Primary Cell (PCell). In the downlink, the carrier corresponding to the PCell is the Downlink Primary Component Carrier (DL PCC) while in the uplink it is the Uplink Primary Component Carrier (UL PCC).

Depending on UE capabilities, Secondary Cells (SCells) can be configured to form together with the PCell a set of serving cells. In the downlink, the carrier corresponding to an SCell is a Downlink Secondary Component Carrier (DL SCC) while in the uplink it is an Uplink Secondary Component Carrier (UL SCC).

The configured set of serving cells for a UE therefore always consists of one PCell and one or more SCells:

52.    The Accused Instrumentalities provide information related to a maximum output power configuration for at least an uplink component carrier. For example, T-Mobile base stations provide information related to the maximum output power for the uplink component carriers on the serving cell through the information element P-Max.[7]

## 6.2.5    Configured transmitted Power

The UE is allowed to set its configured maximum output power $P_{CMAX}$. The configured maximum output power $P_{CMAX}$ is set within the following bounds:

$P_{CMAX\_L} \leq P_{CMAX} \leq P_{CMAX\_H}$

Where

- $P_{CMAX\_L} = MIN \{ P_{EMAX} - \Delta T_C, \ P_{PowerClass} - MAX(MPR + A\text{-}MPR, P\text{-}MPR) - \Delta T_C \}$

- $P_{CMAX\_H} = MIN \{P_{EMAX}, P_{PowerClass}\}$

- $P_{EMAX}$ is the value given to IE *P-Max,* defined in [7]

## –    *P-Max*

The IE *P-Max* is used to limit the UE's uplink transmission power on a carrier frequency and is used to calculate the parameter *Pcompensation* defined in TS 36.304 [4]. Corresponds to parameter $P_{EMAX}$ or $P_{EMAX,c}$ in TS 36.101 [42]. The UE transmit power on one serving cell shall not exceed the configured maximum UE output power of the serving cell determined by this value as specified in TS 36.101 [42, 6.2.5 or 6.2.5A].

53.    The Accused Instrumentalities determine whether to start a maximum output power reporting for the at least an uplink component carrier in the mobile device according to a characteristic associated to the mobile device or the network. For example, T-Mobile base stations

---

[7] *See, e.g.*, TS 36.101 (v. 10.5.0) § 6.2.5; TS 36.331 (v. 10.4.0) § 6.3.2.

set triggers that cause the start of maximum output power reporting according to characteristics associated to the mobile device or network.[8]

---

## 5.4.6    Power Headroom Reporting

The Power Headroom reporting procedure is used to provide the serving eNB with information about the difference between the nominal UE maximum transmit power and the estimated power for UL-SCH transmission. The reporting period, delay and mapping of Power Headroom are defined in subclause 9.1.8 of [9]. RRC controls Power Headroom reporting by configuring the two timers *periodicPHR-Timer* and *prohibitPHR-Timer*, and by signalling *dl-PathlossChange* which sets the change in measured downlink pathloss to trigger a PHR [8].

A Power Headroom Report (PHR) shall be triggered if any of the following events occur:

- *prohibitPHR-Timer* expires or has expired and the path loss has changed more than *dl-PathlossChange* dB since the last transmission of a PHR when UE has UL resources for new transmission;

- *periodicPHR-Timer* expires;

- upon configuration or reconfiguration of the power headroom reporting functionality by upper layers [8], which is not used to disable the  function.

If the UE has UL resources allocated for new transmission for this TTI:

- if it is the first UL resource allocated for a new transmission since the last MAC reset, start *periodicPHR-Timer*;

- if the Power Headroom reporting procedure determines that at least one PHR has been triggered since the last transmission of a PHR or this is the first time that a PHR is triggered, and;

- if the allocated UL resources can accommodate a PHR MAC control element plus its subheader as a result of logical channel prioritization:

  - obtain the value of the power headroom from the physical layer;

---

54.    When the maximum output power reporting is started, the Accused Instrumentalities determine whether to stop a maximum output power reporting for the at least an uplink component carrier in the mobile device according to a characteristic associated to the mobile device or the network. For example, the T-Mobile base stations set timers according to characteristics associated to the mobile device or network that, upon expiration, cause maximum output power reporting to stop.[9]

---

[8] *See, e.g.*, TS 36.321 (v. 9.3.0) § 5.4.6.
[9] *See, e.g.*, TS 36.321 (v. 9.3.0) § 5.4.6.

> ### 5.4.6    Power Headroom Reporting
>
> The Power Headroom reporting procedure is used to provide the serving eNB with information about the difference between the nominal UE maximum transmit power and the estimated power for UL-SCH transmission. The reporting period, delay and mapping of Power Headroom are defined in subclause 9.1.8 of [9]. RRC controls Power Headroom reporting by configuring the two timers *periodicPHR-Timer* and *prohibitPHR-Timer*, and by signalling *dl-PathlossChange* which sets the change in measured downlink pathloss to trigger a PHR [8].

55.    T-Mobile has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, the '333 Patent under 35 U.S.C. § 271(a) by operating, selling, and/or using, the Accused Instrumentalities in the United States in accordance with 3GPP Standards at least as early as Release 9, including the 4G/LTE or 5G Standards exemplarily detailed above.

56.    In addition to direct infringement, T-Mobile has indirectly infringed and continues to indirectly infringe the '333 Patent by active inducement in violation of 35 U.S.C. § 271(b), at least by manufacturing, supplying, distributing, selling, and/or offering for sale the Accused Instrumentalities, as well as creating and disseminating promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to those products, with knowledge and the intent that use of those products would constitute direct infringement of the '333 Patent.

57.    For example, T-Mobile actively promotes the advantages of its mobile network despite knowing that its customers use the accused functionality in the Accused Instrumentalities when a device, such as user equipment, communicates with T-Mobile's base stations in accordance with the 4G/LTE or 5G Standards exemplarily detailed above.

58.    T-Mobile has also indirectly infringed and continues to indirectly infringe the '333 Patent in violation of 35 U.S.C. § 271(c) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. T-Mobile knows that its products and/or services include hardware components and software instructions that work in concert to perform specific,

intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '333 Patent and are not staple articles of commerce suitable for substantial noninfringing use.

59.     T-Mobile's acts of infringement have caused and continue to cause damage to Acer, and Acer is entitled to recover from T-Mobile the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '333 Patent, together with interest and costs as fixed by the Court.

60.     T-Mobile has had knowledge and notice of the '333 Patent and its infringement from the time that Acer declared to 3GPP or any of its organizational partners that the '333 Patent was essential to the applicable wireless telecommunication standards such as the 4G/LTE Standards and/or 5G Standards, because T-Mobile is a member of 3GPP and/or its organizational partners.

61.     In addition or in the alternative, T-Mobile has had knowledge and notice of the '333 Patent and its infringement of same due to Acer's efforts to engage T-Mobile in good-faith negotiations for licenses to Acer's 4G/LTE and 5G relevant SEPs (such as and including the '333 Patent) on fair, reasonable, and non-discriminatory terms.

62.     Further in addition or in the alternative, T-Mobile has had knowledge and notice of the '333 Patent and its infringement of same at least, and through, the filing and service of the Complaint.

63.     Despite this knowledge, T-Mobile continues to commit the infringing acts mentioned above. To the extent acts constituting direct infringement of the '333 Patent are not performed by T-Mobile, such acts constituting direct infringement of the '333 Patent are performed

by T-Mobile's customers, end-users, or other parties that act at the direction and/or control of T-Mobile, with T-Mobile's knowledge.

64.     T-Mobile's infringement of the '333 Patent is willful and deliberate, entitling Acer to the recovery of enhanced damages under 35 U.S.C. § 284. T-Mobile has infringed and continues to infringe the '333 Patent despite the risk of infringement being either known or so obvious that it should have been known to T-Mobile.

## COUNT II: INFRINGEMENT OF THE '048 PATENT

65.     Acer repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

66.     The '048 Patent generally relates to an apparatus and method for efficient measurement gap configuration in mobile networks. '048 Patent at 1:23–2:25. Measurement gaps are periodic idle periods where a mobile device pauses data transmission and reception to measure communication quality of different frequency channels or radio technologies. *Id.* at 1:32–52. When properly configured by a base station, these gaps enable reliable mobility decisions (*e.g.*, handovers) without disruption to ongoing data transmissions at the mobile device. *Id.* at 1:32–35, 2:14–18.

67.     The claims of the '048 Patent recite novel and inventive systems and methods for configuring measurement gaps by using staggered offsets across multiple component carriers. The patented inventions overcome technical challenges in advanced wireless telecommunication networks that support carrier aggregation functionality (*e.g.*, the combination of multiple frequency bands for faster data), including for example, the problem of preserving data throughput and efficiency during mobility-related measurements.

68.     Acer declared the '048 Patent as essential to certain 3GPP wireless telecommunication Standards, including Release 15 (and later) and its technical specifications,

including but not limited to TS 38.300, TS 38.331, and TS 36.101, which include inventions covered by the '048 Patent.

69.    T-Mobile has and continues, without authorization, to operate and use the Accused Instrumentalities in a manner that practices at least one claim of the '048 Patent literally or under the doctrine of equivalents. At a minimum, such Accused Instrumentalities include T-Mobile's mobile network, including cellular base stations and related telecommunication equipment configured to operate in accordance with 3GPP Standards at least as early as Release 15.

70.    By way of example, the Accused Instrumentalities infringe at least claim 1 of the '048 Patent, which recites:

> 1. A method of handling measurement gap configuration for a network in a wireless communication system comprising a mobile device capable of receiving on a plurality of component carriers, the method comprising:
>
> configuring one measurement gap configuration to the mobile device with a first gap offset for at least a first component carrier of the plurality of component carriers and with a second gap offset for at least a second component carrier of the plurality of component carriers, wherein each of the first and second gap offsets indicates a value for shifting a measurement gap in one of the at least a first and second component carriers of the plurality of component carriers, whereby the mobile device configured with the one measurement gap configuration performs measurement by the at least a first component carrier according to the first gap offset at different time from the mobile device performs measurement by the at least a second component carrier according to the second gap offset.

71.    The Accused Instrumentalities handle measurement gap configuration for a network in a wireless communication system comprising a mobile device capable of receiving on a plurality of component carriers, consistent with the requirements in 3GPP Standards. For example, Release 15's technical specifications provide procedures for measurement gap configuration, initiated by the mobile network comprising the Accused Instrumentalities.[10]

---

[10] *See, e.g.*, TS 38.331 (v. 15.3.0) §§ 5.5.2, 6.2.2.

## 5.5.2    Measurement configuration

### 5.5.2.1    General

[. . .]

  1> if the received *measConfig* includes the *measGapConfig*:

    2> perform the measurement gap configuration procedure as specified in 5.5.2.9;

### 5.5.2.9    Measurement gap configuration

The UE shall:

  1> if *gapFR1* is set to setup:

    2> if an FR1 measurement gap configuration is already setup, release the FR1 measurement gap configuration;

    2> setup the FR1 measurement gap configuration indicated by the *measGapConfig* in accordance with the received *gapOffset*, i.e., the first subframe of each gap occurs at an SFN and subframe meeting the following condition:

      SFN mod $T$ = FLOOR(*gapOffset*/10);

      subframe = *gapOffset* mod 10;

      with $T$ = MGRP/10 as defined in TS 38.133 [14];

    2> if *mgta* is configured, apply the specified timing advance to the gap occurrences calculated above (i.e. the UE starts the measurement *mgta* ms before the gap subframe occurrences);

  1> else if *gapFR1* is set to release:

    2> release the FR1 measurement gap configuration;

  1> if *gapFR2* is set to setup:

    2> if an FR2 measurement gap configuration is already setup, release the FR2 measurement gap configuration;

    2> setup the FR2 measurement gap configuration indicated by the *measGapConfig* in accordance with the received *gapOffset*, i.e., the first subframe of each gap occurs at an SFN and subframe meeting the following condition:

      SFN mod $T$ = FLOOR(*gapOffset*/10);

```
6.2.2    Message definitions
[ . . . ]
–       RRCReconfiguration

The RRCReconfiguration message is the command to modify an RRC connection. It may convey information for measurement configuration, mobility control, radio resource
configuration (including RBs, MAC main configuration and physical channel configuration) including and security configuration.

Signalling radio bearer: SRB1 or SRB3

RLC-SAP: AM

Direction: Network to UE

                                         RRCReconfiguration message

-- ASN1START
-- TAG-RRCRECONFIGURATION-START

RRCReconfiguration ::=               SEQUENCE {
    rrc-TransactionIdentifier            RRC-TransactionIdentifier,
    criticalExtensions                   CHOICE {
        rrcReconfiguration                   RRCReconfiguration-IEs,
        criticalExtensionsFuture             SEQUENCE {}
    }
}

RRCReconfiguration-IEs ::=           SEQUENCE {
    radioBearerConfig                    RadioBearerConfig                               OPTIONAL, -- Need M
    secondaryCellGroup                   OCTET STRING (CONTAINING CellGroupConfig)       OPTIONAL, -- Need M
    measConfig                           MeasConfig                                      OPTIONAL, -- Need M
    lateNonCriticalExtension             OCTET STRING                                    OPTIONAL,
    nonCriticalExtension                 RRCReconfiguration-v1530-IEs                    OPTIONAL
}
```

72.    Additionally, the wireless communication system comprises a mobile device capable of receiving on a plurality of component carriers. For example, a mobile device may simultaneously transmit on multiple component carriers by using carrier aggregation functionality.[11]

```
5.4.1    Carrier aggregation

In Carrier Aggregation (CA), two or more Component Carriers (CCs) are aggregated. A UE may simultaneously
receive or transmit on one or multiple CCs depending on its capabilities. CA is supported for both contiguous and non-
contiguous CCs. When CA is deployed frame timing and SFN are aligned across cells that can be aggregated. The
maximum number of configured CCs for a UE is 16 for DL and 16 for UL.
```

73.    The Accused Instrumentalities configure one measurement gap configuration to the mobile device with a first gap offset for at least a first component carrier of the plurality of component carriers and with a second gap offset for at least a second component carrier of the plurality of component carriers. For example, T-Mobile's mobile network provides measurement

---

[11] *See, e.g.*, TS 38.300 (v. 15.3.1) § 5.4.

gap configuration to the mobile device (UE) with a first gap offset (gapFR1) and a second gap offset (gapFR2).[12]

---

**5.5.2.9      Measurement gap configuration**

The UE shall:

1> if *gapFR1* is set to setup:

    2> if an FR1 measurement gap configuration is already setup, release the FR1 measurement gap configuration;

    2> setup the FR1 measurement gap configuration indicated by the *measGapConfig* in accordance with the received *gapOffset*, i.e., the first subframe of each gap occurs at an SFN and subframe meeting the following condition:

        SFN mod $T$ = FLOOR(*gapOffset*/10);

        subframe = *gapOffset* mod 10;

        with $T$ = MGRP/10 as defined in TS 38.133 [14];

    2> if *mgta* is configured, apply the specified timing advance to the gap occurrences calculated above (i.e. the UE starts the measurement *mgta* ms before the gap subframe occurrences);

---

**5.5.2.9      Measurement gap configuration**

[ . . . ]

1> if *gapFR2* is set to setup:

    2> if an FR2 measurement gap configuration is already setup, release the FR2 measurement gap configuration;

    2> setup the FR2 measurement gap configuration indicated by the *measGapConfig* in accordance with the received *gapOffset*, i.e., the first subframe of each gap occurs at an SFN and subframe meeting the following condition:

        SFN mod $T$ = FLOOR(*gapOffset*/10);

        subframe = *gapOffset* mod 10;

        with $T$ = MGRP/10 as defined in TS 38.133 [14];

    2> if *mgta* is configured, apply the specified timing advance to the gap occurrences calculated above (i.e. the UE starts the measurement *mgta* ms before the gap subframe occurrences);

---

    74.    In addition, the first gap offset (gapFR1) is for at least a first component carrier of the plurality of component carriers and the second gap offset (gapFR2) is for at least a second component carrier of the plurality of component carriers.[13]

---

[12] *See, e.g.*, TS 38.331 (v. 15.3.0) §§ 5.5.2.

[13] *See, e.g.*, TS 38.331 (v. 15.3.0) § 6.2.2; TS 38.101-3 (v. 15.3.0) § 5.2A.



75. In the Accused Instrumentalities, each of the first and second gap offsets indicates a value for shifting a measurement gap in one of the at least a first and second component carriers of the plurality of component carriers. For example, gapOffset defines the timing offset and shifts the measurement gap for each component carrier.[14]

---

6.2.2     Message definitions

[ . . . ]

*MeasGapConfig* field descriptions

**gapFR1**
Indicates measurement gap configuration that applies to FR1 only. In the case of EN-DC, *gapFR1* cannot be set up by NR RRC (i.e. only LTE RRC can configure FR1 gap). *gapFR1* can not be configured together with *gapUE*. The applicability of the measurement gap is according to Table 9.1.2-2 in TS 38.133 [14].

**gapFR2**
Indicates measurement gap configuration applies to FR2 only. *gapFR2* cannot be configured together with *gapUE*. The applicability of the measurement gap is according to Table 9.1.2-1 and Table 9.1.2-2 in TS 38.133 [14].

**gapUE**
Indicates measurement gap configuration that applies to all frequencies (FR1 and FR2). In the case of EN-DC, *gapUE* cannot be set up by NR RRC (i.e. only LTE RRC can configure per UE gap). If *gapUE* is configured, then neither *gapFR1* nor *gapFR2* can be configured. The applicability of the measurement gap is according to Table 9.1.2-1 in TS 38.133 [14].

**gapOffset**
Value *gapOffset* is the gap offset of the gap pattern with MGRP indicated in the field *mgrp*. The value range should be from 0 to *mgrp*-1.

---

[14] *See, e.g.,* TS 38.331 (v. 15.3.0) §§ 5.5.2, 6.2.2.

**5.5.2.9    Measurement gap configuration**

The UE shall:

1> if *gapFR1* is set to setup:

    2> if an FR1 measurement gap configuration is already setup, release the FR1 measurement gap configuration;

    2> setup the FR1 measurement gap configuration indicated by the *measGapConfig* in accordance with the received *gapOffset*, i.e., the first subframe of each gap occurs at an SFN and subframe meeting the following condition:

    SFN mod $T$ = FLOOR(*gapOffset*/10);

    subframe = *gapOffset* mod 10;

    with $T$ = MGRP/10 as defined in TS 38.133 [14];

    2> if *mgta* is configured, apply the specified timing advance to the gap occurrences calculated above (i.e. the UE starts the measurement *mgta* ms before the gap subframe occurrences);

1> else if *gapFR1* is set to release:

    2> release the FR1 measurement gap configuration;

1> if *gapFR2* is set to setup:

    2> if an FR2 measurement gap configuration is already setup, release the FR2 measurement gap configuration;

    2> setup the FR2 measurement gap configuration indicated by the *measGapConfig* in accordance with the received *gapOffset*, i.e., the first subframe of each gap occurs at an SFN and subframe meeting the following condition:

    SFN mod $T$ = FLOOR(*gapOffset*/10);

    subframe = *gapOffset* mod 10;

    with $T$ = MGRP/10 as defined in TS 38.133 [14];

    2> if *mgta* is configured, apply the specified timing advance to the gap occurrences calculated above (i.e. the UE starts the measurement *mgta* ms before the gap subframe occurrences);

76.    In the Accused Instrumentalities, the mobile device configured with the one measurement gap configuration performs measurement by the at least a first component carrier according to the first gap offset at different time from the mobile device performs measurement by the at least a second component carrier according to the second gap offset. For example, when the measurement gap of different component carriers is different, the mobile device (UE) will perform measurement for each component carrier at a different time.[15]

---

[15] *See, e.g.*, TS 38.300 (v. 15.3.1) § 9.2; TS 38.331 (v. 15.3.0) § 5.5.

### 9.2.4    Measurements

[. . .]

Whether a measurement is non-gap-assisted or gap-assisted depends on the capability of the UE, the active BWP of the UE and the current operating frequency. In non-gap-assisted scenarios, the UE shall be able to carry out such measurements without measurement gaps. In gap-assisted scenarios, the UE cannot be assumed to be able to carry out such measurements without measurement gaps.

## 5.5    Measurements

### 5.5.1    Introduction

[. . .]

5.  **Measurement gaps:** Periods that the UE may use to perform measurements, i.e. no (UL, DL) transmissions are scheduled.

### 5.5.2.9    Measurement gap configuration

The UE shall:

1> if *gapFR1* is set to setup:

  2> if an FR1 measurement gap configuration is already setup, release the FR1 measurement gap configuration;

  2> setup the FR1 measurement gap configuration indicated by the *measGapConfig* in accordance with the received *gapOffset*, i.e., the first subframe of each gap occurs at an SFN and subframe meeting the following condition:

  SFN mod $T$ = FLOOR(*gapOffset*/10);

  subframe = *gapOffset* mod 10;

  with $T$ = MGRP/10 as defined in TS 38.133 [14];

  2> if *mgta* is configured, apply the specified timing advance to the gap occurrences calculated above (i.e. the UE starts the measurement *mgta* ms before the gap subframe occurrences);

1> else if *gapFR1* is set to release:

  2> release the FR1 measurement gap configuration;

1> if *gapFR2* is set to setup:

  2> if an FR2 measurement gap configuration is already setup, release the FR2 measurement gap configuration;

  2> setup the FR2 measurement gap configuration indicated by the *measGapConfig* in accordance with the received *gapOffset*, i.e., the first subframe of each gap occurs at an SFN and subframe meeting the following condition:

  SFN mod $T$ = FLOOR(*gapOffset*/10);

  subframe = *gapOffset* mod 10;

  with $T$ = MGRP/10 as defined in TS 38.133 [14];

  2> if *mgta* is configured, apply the specified timing advance to the gap occurrences calculated above (i.e. the UE starts the measurement *mgta* ms before the gap subframe occurrences);

77.     T-Mobile has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, the '048 Patent under 35 U.S.C. § 271(a) by operating, selling, and/or using, the Accused Instrumentalities in accordance with 3GPP Standards at least as early as Release 15, including the 4G/LTE or 5G Standards exemplarily detailed above.

78.     In addition to direct infringement, T-Mobile has indirectly infringed and continues to indirectly infringe the '048 Patent by active inducement in violation of 35 U.S.C. § 271(b), at least by manufacturing, supplying, distributing, selling, and/or offering for sale the Accused Instrumentalities, as well as creating and disseminating promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to those products, with knowledge and the intent that use of those products would constitute direct infringement of the '048 Patent.

79.     For example, T-Mobile actively promotes the advantages of its mobile network despite knowing that its customers use the accused functionality in the Accused Instrumentalities when a device, such as user equipment, communicates with T-Mobile's base stations in accordance with the 4G/LTE or 5G Standards exemplarily detailed above.

80.     T-Mobile has also indirectly infringed and continues to indirectly infringe the '048 Patent in violation of 35 U.S.C. § 271(c) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. T-Mobile knows that its products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '048 Patent and are not staple articles of commerce suitable for substantial noninfringing use.

81.     T-Mobile's acts of infringement have caused and continue to cause damage to Acer, and Acer is entitled to recover from T-Mobile the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '048 Patent, together with interest and costs as fixed by the Court.

82.     T-Mobile has had knowledge and notice of the '048 Patent and its infringement from the time that Acer declared to 3GPP or any of its organizational partners that the '048 Patent was essential to the applicable wireless telecommunication standards such as the 4G/LTE Standards and/or 5G Standards, because T-Mobile is a member of 3GPP and/or its organizational partners.

83.     In addition or in the alternative, T-Mobile has had knowledge and notice of the '048 Patent and its infringement of same due to Acer's efforts to engage T-Mobile in good-faith negotiations for licenses to Acer's 4G/LTE and 5G relevant SEPs (such as and including the '048 Patent) on fair, reasonable, and non-discriminatory terms.

84.     Further in addition or in the alternative, T-Mobile has had knowledge and notice of the '048 Patent and its infringement of same at least, and through, the filing and service of the Complaint.

85.     Despite this knowledge, T-Mobile continues to commit the infringing acts mentioned above. To the extent acts constituting direct infringement of the '048 Patent are not performed by T-Mobile, such acts constituting direct infringement of the '048 Patent are performed by T-Mobile's customers, end-users, or other parties that act at the direction and/or control of T-Mobile, with T-Mobile's knowledge.

86.    T-Mobile's infringement of the '048 Patent is willful and deliberate, entitling Acer to the recovery of enhanced damages under 35 U.S.C. § 284. T-Mobile has infringed and continues to infringe the '048 Patent despite the risk of infringement being either known or so obvious that it should have been known to T-Mobile.

## COUNT III: INFRINGEMENT OF THE '097 PATENT

87.    Acer repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

88.    The '097 Patent generally relates to an apparatus and method for improved radio bearer establishment in 4G/LTE and 5G networks that support dual connectivity. '097 Patent at 1:20–2:32. Frameworks for dual connectivity allow multiple base stations to serve a single mobile device. *Id.* at 1:25–44. To maintain improved throughput to a mobile device under this framework, however, a network must perform efficient radio bearer establishment for multiple base stations. *Id.*

89.    The claims of the '097 Patent recite novel and inventive systems and methods for determining the establishment or release of radio bearers under a dual connectivity framework, thereby enabling improved resource control and reliable data transmission and reception in mobile networks. The patented inventions are solutions to technical challenges in enabling dual connectivity in advanced wireless telecommunication networks, including for example, the problem of effective radio bearer establishment for multiple network nodes.

90.    Acer declared the '097 Patent as essential to certain 3GPP Standards, including Release 14 (and later) and its technical specifications, including but not limited to TS 36.300, TS 36.331 and TS 36.423, which include inventions covered by the '097 Patent.

91.    T-Mobile has and continues, without authorization, to operate and use the Accused Instrumentalities in a manner that practices at least one claim of the '097 Patent literally or under

the doctrine of equivalents. At a minimum, such Accused Instrumentalities include T-Mobile's mobile network, including cellular base stations and related telecommunication equipment configured to operate in accordance with 3GPP Standards at least as early as Release 14.

92.    By way of example, the Accused Instrumentalities infringe at least claim 1 of the '097 Patent, which recites:

> 1. A method of radio bearer establishment in dual connectivity, for a first base station in a wireless communication system, comprising:
>
> connecting to a communication device of the wireless communication system;
>
> determining whether to establish or release at least a radio bearer for the communication device on at least a second base station;
>
> transmitting a request message including information of the at least a radio bearer to be established or released on the at least a second base station, to the at least a second base station; and
>
> receiving a response message including information about accepting or rejecting establishment or release for the at least a radio bearer on the at least a second base station, from the at least a second base station, wherein the response message includes information of at least one of identities of radio bearers to be accepted or rejected to be established or released, release acknowledgement, information related to configuration of radio bearers on the at least a second base station, and information related to connection setup to the at least a second base station.

93.    The Accused Instrumentalities handle radio bearer establishment in dual connectivity, for a first base station in a wireless communication system, consistent with the requirements in 3GPP Standards. For example, Release 14's technical specifications provide procedures for handling radio bearer establishment in dual connectivity.[16]

---

[16] *See, e.g.*, TS 36.300 (v. 14.2.0) § 10.1.2.8.

**10.1.2.8     Dual Connectivity operation**

[. . .]

**10.1.2.8.2     SeNB Modification**

The SeNB Modification procedure may be initiated either by the MeNB or by the SeNB and be used to modify, establish or release bearer contexts, to transfer bearer contexts to and from the SeNB or to modify other properties of the UE context within the same SeNB.

94.     The Accused Instrumentalities connect to a communication device of the wireless communication system. For example, T-Mobile implements procedures for connecting to user equipment (UE), or the communication device.[17]



**Figure 10.1.2.8.2-1: SeNB Modification procedure - MeNB initiated**

95.     The Accused Instrumentalities determine whether to establish or release at least a radio bearer for the communication device on at least a second base station. For example, T-Mobile determines whether to establish or release a radio bearer for a UE on a second base station (SeNB).[18]

---

[17] *See, e.g.*, TS 36.300 (v. 14.2.0) § 10.1.2.8.
[18] *See, e.g.*, TS 36.300 (v. 14.2.0) § 10.1.2.8.

---

**10.1.2.8.2        SeNB Modification**

The SeNB Modification procedure may be initiated either by the MeNB or by the SeNB and be used to modify, establish or release bearer contexts, to transfer bearer contexts to and from the SeNB or to modify other properties of the UE context within the same SeNB.

[. . .]

The MeNB uses the procedure to initiate configuration changes of the SCG within the same SeNB, e.g. the addition or release of SCG SCells, the addition, modification or release of SCG bearer(s) and the SCG part of split bearer(s) and to trigger PSCell change involving PSCell release. The SeNB may reject the request, except if it concerns the release of SCG cells, of SCG bearer(s) or the SCG part of split bearer(s). Figure 10.1.2.8.2-1 shows an example signalling flow for a MeNB initiated SeNB Modification procedure.

---

96.    The Accused Instrumentalities transmit a request message including information of the at least a radio bearer to be established or released on the at least a second base station, to the at least a second base station. For example, T-Mobile base stations transmit a request message to a second base station (SeNB), including information of the radio bearer E-RABs to be established or released.[19]

---

**10.1.2.8.2        SeNB Modification**

[. . .]



[. . .]

1.  The MeNB sends the SeNB Modification Request message, which may contain bearer context related or other UE context related information, data forwarding address information (if applicable) and *SCG-ConfigInfo* which contains the MCG configuration and the entire UE capabilities for UE capability coordination to be used as basis for the reconfiguration by the SeNB. In case of SCG SCell addition request, the MeNB can provide the latest measurement results for the SCG cell(s) requested to be added and SCG serving cell(s). In case of SCG Change, SCG Change Indication is included.

NOTE:    MeNB may request the establishment or release of SCG or Split bearer while not reconfiguration to MCG bearer, which can be performed without SCG change.

---

[19] *See, e.g.*, TS 36.300 (v. 14.2.0) § 10.1.2.8; TS 36.423 (v. 14.2.0) § 9.1.3.5.

### 9.1.3.5     SENB MODIFICATION REQUEST

This message is sent by the MeNB to the SeNB to request the preparation to modify SeNB resources for a specific UE.

Direction: MeNB → SeNB.

[. . .]

| IE/Group Name | Presence | Range | IE type and reference | Semantics description | Criticality | Assigned Criticality |
|---|---|---|---|---|---|---|
| [. . .] | | | | | | |
| >E-RABs To Be Added List | | 0..1 | | | – | – |
| [. . .] | | | | | | |
| >E-RABs To Be Released List | | 0..1 | | | – | – |

97.    The Accused Instrumentalities receive a response message including information about accepting or rejecting establishment or release for the at least a radio bearer on the at least a second base station, from the at least a second base station. For example, T-Mobile base stations receive a response message (SeNB Modification Request Acknowledge), including information about accepting or rejecting establishment or release for the radio bearer on the second base station.[20]

---

[20] *See, e.g.*, TS 36.300 (v. 14.2.0) § 10.1.2.8.



98.    In addition, the response message includes information of at least one of the identities of radio bearers to be accepted or rejected to be established or released, release acknowledgement, information related to configuration of radio bearers on the at least a second base station, and information related to connection setup to the at least a second base station. For example, the SeNB Modification Request Acknowledge message includes information on the radio bearer E-RABs to be established or released, as well as radio configuration information generated by the SeNB.[21]

---

[21] *See, e.g.*, TS 36.300 (v. 14.2.0) § 10.1.2.8; TS 36.423 (v. 14.2.0) § 9.1.3.6.

**10.1.2.8.2        SeNB Modification**

[. . .]

2. The SeNB responds with the SeNB Modification Request Acknowledge message, which may contain radio configuration information within *SCG-Config* message and data forwarding address information (if applicable). In this step, the SeNB does not initiate an SCG change i.e. the *SCG-Config* message indicates an SCG Change only if the MeNB included the SCG Change Indication in the SeNB Modification Request message (as an SCG change initiated by the SeNB would subsequently require an SCG counter from the MeNB). In case of SCG Change, for E-RABs configured with the split bearer option for which no bearer type change is performed, the SeNB provides a new DL GTP TEID to the MeNB. The MeNB shall continue sending DL PDCP PDUs to the SeNB with the previous DL GTP TEID until it performs PDCP re-establishment or PDCP data recovery, and use the new DL GTP TEID starting with the PDCP re-establishment or data recovery.

**9.1.3.6        SENB MODIFICATION REQUEST ACKNOWLEDGE**

This message is sent by the SeNB to confirm the MeNB's request to modify the SeNB resources for a specific UE.

Direction: SeNB → MeNB.

[. . .]

| IE/Group Name | Presence | Range | IE type and reference | Semantics description | Criticality | Assigned Criticality |
|---|---|---|---|---|---|---|
| [. . .] | | | | | | |
| **E-RABs Admitted List** | | *0..1* | | | YES | ignore |
| **>E-RABs Admitted To Be Added List** | | *1* | | | – | – |
| [. . .] | | | | | | |
| **>E-RABs Admitted To Be Released List** | | *0..1* | | | – | – |

99.     T-Mobile has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, the '097 Patent under 35 U.S.C. § 271(a) by operating, selling, and/or using the Accused Instrumentalities in the United States in accordance with 3GPP Standards at least as early as Release 14, including the 4G/LTE or 5G Standards exemplarily detailed above.

100.     In addition to direct infringement, T-Mobile has indirectly infringed and continues to indirectly infringe the '097 Patent by active inducement in violation of 35 U.S.C. § 271(b), at least by manufacturing, supplying, distributing, selling, and/or offering for sale the Accused Instrumentalities, as well as creating and disseminating promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to those products, with knowledge and the intent that use of those products would constitute direct infringement of the '097 Patent.

101.    For example, T-Mobile actively promotes the advantages of its mobile network despite knowing that its customers use the accused functionality in the Accused Instrumentalities when a device, such as user equipment, communicates with T-Mobile's base stations in accordance with the 4G/LTE or 5G Standards exemplarily detailed above.

102.    T-Mobile has also indirectly infringed and continues to indirectly infringe the '097 Patent in violation of 35 U.S.C. § 271(c) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. T-Mobile knows that its products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '097 Patent and are not staple articles of commerce suitable for substantial noninfringing use.

103.    T-Mobile's acts of infringement have caused and continue to cause damage to Acer, and Acer is entitled to recover from T-Mobile the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '097 Patent, together with interest and costs as fixed by the Court.

104.    T-Mobile has had knowledge and notice of the '097 Patent and its infringement from the time that Acer declared to 3GPP or any of its organizational partners that the '097 Patent was essential to the applicable wireless telecommunication standards such as the 4G/LTE Standards and/or 5G Standards, because T-Mobile is a member of 3GPP and/or its organizational partners.

105.    In addition or in the alternative, T-Mobile has had knowledge and notice of the '097 Patent and its infringement of same due to Acer's efforts to engage T-Mobile in good-faith

negotiations for licenses to Acer's 4G/LTE and 5G relevant SEPs (such as and including the '097 Patent) on fair, reasonable, and non-discriminatory terms.

106.    Further in addition or in the alternative, T-Mobile has had knowledge and notice of the '097 Patent and its infringement of same at least, and through, the filing and service of the Complaint.

107.    Despite this knowledge, T-Mobile continues to commit the infringing acts mentioned above. To the extent acts constituting direct infringement of the '097 Patent are not performed by T-Mobile, such acts constituting direct infringement of the '097 Patent are performed by T-Mobile's customers, end-users, or other parties that act at the direction and/or control of T-Mobile, with T-Mobile's knowledge.

108.    T-Mobile's infringement of the '097 Patent is willful and deliberate, entitling Acer to the recovery of enhanced damages under 35 U.S.C. § 284. T-Mobile has infringed and continues to infringe the '097 Patent despite the risk of infringement being either known or so obvious that it should have been known to T-Mobile.

### COUNT IV: INFRINGEMENT OF THE '791 PATENT

109.    Acer repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

110.    The '791 Patent generally relates to a method for updating network detection and selection information, as well as traffic routing information, for a mobile device in a mobile network. '791 Patent at 1:17–2:35. At the time of invention, 3GPP standards proposed mechanisms for using an Access Network Discovery and Selection Function (ANDSF) network element to assist a mobile device with selecting from different types of access networks, such as the cellular network (*e.g.*, 3GPP access like 4G/LTE) or non-cellular networks (*e.g.*, non-3GPP access, such as Wi-Fi). *Id.* at 1:24–38. This included using network detection and selection information (*e.g.*,

preferred Wi-Fi SSIDs or access points) that a mobile device uses to discover available networks and decide which network to connect to or prioritize. *See, e.g.*, *id.* at 1:32–38, 1:48–62. This also included using traffic routing information (*e.g.*, ISMP and ISRP information) that helps a mobile device distribute or route data traffic flows. *See, e.g.*, *id.* at 1:32–47.

111.    The claims of the '791 Patent recite novel and inventive methods for updating this information efficiently during procedures such as handover, area update, or attach procedures, by using Radio Access Network (RAN) assistance information to enable improved network selection and traffic routing decisions. The patented inventions are solutions to technical challenges in advanced wireless telecommunication networks that support ANDSF, including for example, the problem where RAN assistance information becomes out-of-date when a mobile device changes to a different RAN access node.

112.    Acer declared the '791 Patent as essential to certain 3GPP Standards, including Release 14 (and later) and its technical specifications, including but not limited to TS 36.331, which include inventions covered by the '791 Patent.

113.    T-Mobile has and continues, without authorization, to operate and use the Accused Instrumentalities in a manner that practices at least one claim of the '791 Patent literally or under the doctrine of equivalents. At a minimum, such Accused Instrumentalities include T-Mobile's mobile network, including cellular base stations and related telecommunication equipment configured to operate in accordance with 3GPP Standards at least as early as Release 14.

114.    By way of example, the Accused Instrumentalities infringe at least claim 14 of the '791 Patent, which recites:

>   14. A method of updating network detection and selection information and traffic routing information for a network in a wireless communication system, the method comprising:

updating network detection and selection information and traffic routing information during a handover procedure, an area update procedure, or an attach procedure;

wherein the updating step comprises:

receiving a contact request message from a communication device of the wireless communication system; and

transmitting a connection reconfiguration message including the network detection and selection information and traffic routing information of the attach procedure, to the communication device, wherein the connection reconfiguration message includes parameters of RAN assistance information/RAN rules.

115.     The Accused Instrumentalities update network detection and selection information and traffic routing information for a network in a wireless communication system, consistent with the requirements in 3GPP Standards. For example, Release 14's technical specifications provide procedures for updating network detection and selection information and traffic routing information by sending RRCConnectionReconfiguration with wlan-OffloadInfo.[22]

---

**5.3.5.3        Reception of an *RRCConnectionReconfiguration* not including the *mobilityControlInfo* by the UE**

If the *RRCConnectionReconfiguration* message does not include the *mobilityControlInfo* and the UE is able to comply with the configuration included in this message, the UE shall:

[. . .]

1> if the *RRCConnectionReconfiguration* message includes *wlan-OffloadInfo*:

    2> perform the dedicated WLAN offload configuration procedure as specified in 5.6.12.2;

---

**5.4.2.3        Reception of the *RRCConnectionReconfiguration* by the UE**

If the UE is able to comply with the configuration included in the *RRCConnectionReconfiguration* message, the UE shall:

[. . .]

1> if the *RRCConnectionReconfiguration* message includes *wlan-OffloadInfo*:

    2> perform the dedicated WLAN offload configuration procedure as specified in 5.6.12.2;

---

[22] *See, e.g.*, TS 36.331 (v. 14.4.0) §§ 5.3.5.3, 5.4.2.3, 5.6.12.

### 5.6.12    RAN-assisted WLAN interworking

#### 5.6.12.1    General

The purpose of this procedure is to facilitate access network selection and traffic steering between E-UTRAN and WLAN.

[. . .]

#### 5.6.12.2    Dedicated WLAN offload configuration

The UE shall:

1> if the received *wlan-OffloadInfo* is set to *release*:

2> release *wlan-OffloadConfigDedicated* and *t350*;

116. The Accused Instrumentalities update network detection and selection information and traffic routing information during a handover procedure, an area update procedure, or an attach procedure. For example, T-Mobile base stations comprising the Accused Instrumentalities update network detection and selection information and traffic routing information using RRCConnectionReconfiguration during an attach procedure.[23]

### 5.3.2    Attach procedure

#### 5.3.2.1    E-UTRAN Initial Attach

A UE/user needs to register with the network to receive services that require registration. This registration is described as Network Attachment. The always-on IP connectivity for UE/users of the EPS may be enabled by establishing a default EPS bearer during Network Attachment. The PCC rules applied to the default EPS bearer may be predefined in the PDN GW and activated in the attachment by the PDN GW itself. The Attach procedure may trigger one or multiple Dedicated Bearer Establishment procedures to establish dedicated EPS bearer(s) for that UE. During the attach procedure, the UE may request for an IP address allocation. Terminals utilising only IETF based mechanisms for IP address allocation are also supported.

[. . .]



[. . .]

---

[23] *See, e.g.*, TS 23.401 (v. 14.3.0) § 5.3.2.

117.    In the Accused Instrumentalities, the updating step comprises receiving a contact request message from a communication device of the wireless communication system. For example, the attach procedure includes the step of receiving a contact request message (Attach Request) from a communication device (UE).[24]



118.    In the Accused Instrumentalities, the updating step further comprises transmitting a connection reconfiguration message including the network detection and selection information and traffic routing information of the attach procedure, to the communication device. For example, the attach procedure includes the step of transmitting a connection reconfiguration message (RRCConnectionReconfiguration), which includes network detection and selection information and traffic routing information in the information element wlan-OffloadInfo.[25]

---

[24] *See, e.g.*, TS 23.401 (v. 14.3.0) § 5.3.2.
[25] *See, e.g.*, TS 23.401 (v. 14.3.0) § 5.3.2; TS 36.331 (v. 14.4.0) §§ 6.2.2, 6.3.6.



## 5.3.2     Attach procedure

### 5.3.2.1     E-UTRAN Initial Attach

[. . .]

[. . .]

[. . .]

18. If the eNodeB received an S1-AP Initial Context Setup Request the eNodeB sends the RRC Connection Reconfiguration message including the EPS Radio Bearer Identity to the UE, and the Attach Accept message will be sent along to the UE.

## 6.2.2     Message definitions

[. . .]

–          *RRCConnectionReconfiguration*

The *RRCConnectionReconfiguration* message is the command to modify an RRC connection. It may convey information for measurement configuration, mobility control, radio resource configuration (including RBs, MAC main configuration and physical channel configuration) including any associated dedicated NAS information and security configuration.

## 6.3.6     Other information elements

[. . .]

–          *WLAN-OffloadConfig*

The IE *WLAN-OffloadConfig* includes information for traffic steering between E-UTRAN and WLAN. The fields are applicable to both RAN-assisted WLAN interworking based on access network selection and traffic steering rules and RAN-assisted WLAN interworking based on ANDSF policies unless stated otherwise in the field description.

119.     In the Accused Instrumentalities, the connection reconfiguration message includes parameters of RAN assistance information/RAN rules. For example, T-Mobile base stations transmit the RRCConnectionReconfiguration message that includes RAN assistance parameters.[26]

---

[26] *See, e.g.*, TS 36.304 (v. 14.4.0) § 5.6; TS 36.331 (v.14.4.0) §§ 5.6.12, 6.3.6.

## 5.6 RAN-assisted WLAN interworking

The purpose of this procedure is to facilitate RAN-assisted WLAN interworking.

### 5.6.1 RAN assistance parameter handling in RRC_IDLE

RAN assistance parameters may be provided to the UE in *SystemInformationBlockType17* or in the *RRCConnectionReconfiguration* message. RAN assistance parameters are used only if the UE is camped normally.

### 5.6.2 Access network selection and traffic steering rules

The rules in this sub-clause are only applicable for WLANs for which identifiers has been signaled to the UE by E-UTRAN and the UE is capable of RAN-assisted WLAN interworking based on access network selection and traffic steering rules. Coexistence with ANDSF based WLAN selection and traffic steering methods on the UE is based on mechanism described in TS 23.402 [25]. The rules refer to the following quantities:

### 5.6.3 RAN assistance parameters definition

The following RAN assistance parameters for RAN-assisted WLAN interworking may be provided:

**Thresh**$_{ServingOffloadWLAN, LowP}$

This specifies the RSRP threshold (in dBm) used by the UE for traffic steering to from E-UTRAN to WLAN.

**Thresh**$_{ServingOffloadWLAN, HighP}$

This specifies the RSRP threshold (in dBm) used by the UE for traffic steering from WLAN to E-UTRAN.

**Thresh**$_{ServingOffloadWLAN, LowQ}$

This specifies the RSRQ threshold (in dB) used by the UE for traffic steering from E-UTRAN to WLAN.

**Thresh**$_{ServingOffloadWLAN, HighQ}$

This specifies the RSRQ threshold (in dB) used by the UE for traffic steering from WLAN to E-UTRAN.

**Thresh**$_{ChUtilWLAN, Low}$

This specifies the WLAN channel utilization (BSS load) threshold used by the UE for traffic steering from E-UTRAN to WLAN.

120.    T-Mobile has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, the '791 Patent under 35 U.S.C. § 271(a) by operating, selling, and/or using the Accused Instrumentalities in the United States in accordance with 3GPP Standards at least as early as Release 14, including the 4G/LTE or 5G Standards exemplarily detailed above.

121.    In addition to direct infringement, T-Mobile has indirectly infringed and continues to indirectly infringe the '791 Patent by active inducement in violation of 35 U.S.C. § 271(b), at least by manufacturing, supplying, distributing, selling, and/or offering for sale the Accused

Instrumentalities, as well as creating and disseminating promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to those products, with knowledge and the intent that use of those products would constitute direct infringement of the '791 Patent.

122.    For example, T-Mobile actively promotes the advantages of its mobile network despite knowing that its customers use the accused functionality in the Accused Instrumentalities when a device, such as user equipment, communicates with T-Mobile's base stations in accordance with the 4G/LTE or 5G Standards exemplarily detailed above.

123.    T-Mobile has also indirectly infringed and continues to indirectly infringe the '791 Patent in violation of 35 U.S.C. § 271(c) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. T-Mobile knows that its products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '791 Patent and are not staple articles of commerce suitable for substantial noninfringing use.

124.    T-Mobile's acts of infringement have caused and continue to cause damage to Acer, and Acer is entitled to recover from T-Mobile the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '791 Patent, together with interest and costs as fixed by the Court.

125.    T-Mobile has had knowledge and notice of the '791 Patent and its infringement from the time that Acer declared to 3GPP or any of its organizational partners that the '791 Patent was essential to the applicable wireless telecommunication standards such as the 4G/LTE

Standards and/or 5G Standards, because T-Mobile is a member of 3GPP and/or its organizational partners.

126.    In addition or in the alternative, T-Mobile has had knowledge and notice of the '791 Patent and its infringement of same due to Acer's efforts to engage T-Mobile in good-faith negotiations for licenses to Acer's 4G/LTE and 5G relevant SEPs (such as and including the '791 Patent) on fair, reasonable, and non-discriminatory terms.

127.    Further in addition or in the alternative, T-Mobile has had knowledge and notice of the '791 Patent and its infringement of same at least, and through, the filing and service of the Complaint.

128.    Despite this knowledge, T-Mobile continues to commit the infringing acts mentioned above. To the extent acts constituting direct infringement of the '791 Patent are not performed by T-Mobile, such acts constituting direct infringement of the '791 Patent are performed by T-Mobile's customers, end-users, or other parties that act at the direction and/or control of T-Mobile, with T-Mobile's knowledge.

129.    T-Mobile's infringement of the '791 Patent is willful and deliberate, entitling Acer to the recovery of enhanced damages under 35 U.S.C. § 284. T-Mobile has infringed and continues to infringe the '791 Patent despite the risk of infringement being either known or so obvious that it should have been known to T-Mobile.

## COUNT V: INFRINGEMENT OF THE '053 PATENT

130.    Acer repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

131.    The '053 Patent generally relates to an apparatus and method for handling code block group (CBG)-based communication operations in a mobile network. '053 Patent at 1:16–67. At the time of invention, 3GPP standards proposed CBG-based communication operations to

improve retransmission efficiency of a hybrid automatic repeat request (HARQ) process by grouping code blocks into a CBG. *Id.* at 1:53–60. However, existing systems supported HARQ retransmissions only at the transport block (TB) level, *id.* at 1:61–65, thus requiring retransmission of an entire TB even if only a portion failed decoding.

132.    The claims of the '053 Patent recite novel and inventive systems and methods for configuring CBG-based operations by transmitting a maximum limit number of CBGs in a transport block to a mobile device, obtaining a size of a CBG field and transmitting the CBG field according to the maximum limit number, and performing CBG-based communication operations with the mobile device accordingly. The patented inventions overcome technical challenges in advanced wireless telecommunication networks, including for example, the problem of handling CBGs to enable retransmission efficiency of a HARQ process.

133.    Acer declared the '053 Patent as essential to certain 3GPP Standards, including Release 15 (and later) and its technical specifications, including but not limited to TS 138.331, TS 138.212, TS 138.213, TS 138.214, TS 38.331, TS 38.212, TS 38.213, and TS 38.214, which include inventions covered by the '053 Patent.

134.    T-Mobile has and continues, without authorization, to operate and use the Accused Instrumentalities in a manner that practices at least one claim of the '053 Patent literally or under the doctrine of equivalents. At a minimum, such Accused Instrumentalities include T-Mobile's mobile network, including cellular base stations and related telecommunication equipment configured to operate in accordance with 3GPP Standards at least as early as Release 15.

135.    By way of example, the Accused Instrumentalities infringe at least claim 22 of the '053 Patent, which recites:

> 22. A network for handling a code block group (CBG)-based communication operation, comprising:

at least one storage device; and

at least one processing circuit, coupled to the at least one storage device, wherein the at least one storage device stores instructions, and the at least one processing circuit is configured to execute the instructions of:

transmitting an indication configuring at least one CBG-based communication operation to a communication device;

transmitting a maximum limit number of CBGs in a transport block (TB) for the at least one CBG-based communication operation;

obtaining a size of a CBG field according to the maximum limit number of CBGs;

transmitting the CBG field with the size of the CBG field in a first DL control information (DCI) to the communication device, after obtaining the size of the CBG field, wherein the CBG field indicates at least one transmitted CBG; and

performing the at least one CBG-based communication operation with the communication device according to the maximum limit number of CBGs and the CBG field.

136.    The Accused Instrumentalities comprise a network for handling a code block group (CBG)-based communication operation, consistent with the requirements in 3GPP Standards. For example, Release 15's technical specifications provide procedures for handling a CBG-based communication operation.[27]

### 9.1.1    CBG-based HARQ-ACK codebook determination

If a UE is provided *PDSCH-CodeBlockGroupTransmission* for a serving cell, the UE receives a PDSCH scheduled by DCI format 1_1, that includes code block groups (CBGs) of a transport block. The UE is also provided *maxCodeBlockGroupsPerTransportBlock* indicating a maximum number $N_{\text{HARQ-ACK}}^{\text{CBG/TB,max}}$ of CBGs for generating respective HARQ-ACK information bits for a transport block reception for the serving cell.

137.    The Accused Instrumentalities comprise at least one storage device and at least one processing circuit, coupled to the at least one storage device, wherein the at least one storage device stores instructions, and the at least one processing circuit is configured to execute instructions. For

---

[27] *See, e.g.*, TS 38.213 (v. 16.7.0) § 9.1.1.

example, T-Mobile base stations comprising the Accused Instrumentalities incorporate computing hardware, including a storage device (memory) and circuitry coupled to the memory where the circuitry executes instructions stored on the memory.

138.    The Accused Instrumentalities transmit an indication configuring at least one CBG-based communication operation to a communication device. For example, T-Mobile base stations transmit various higher layer parameters configuring the CBG based communication operation to a communication device, the UE.[28]

---

### 5.1.7    Code block group based PDSCH transmission

#### 5.1.7.1    UE procedure for grouping of code blocks to code block groups

If a UE is configured to receive code block group (CBG) based transmissions by receiving the higher layer parameter *codeBlockGroupTransmission* for PDSCH, the UE shall determine the number of CBGs for a transport block reception as

$$M = \min(N, C),$$

where $N$ is the maximum number of CBGs per transport block as configured by *maxCodeBlockGroupsPerTransportBlock* for PDSCH, and $C$ is the number of code blocks in the transport block according to the procedure defined in Clause 7.2.3 of [5, TS 38.212].

---

#### 5.1.7.2    UE procedure for receiving code block group based transmissions

If a UE is configured to receive code block group-based transmissions by receiving the higher layer parameter *codeBlockGroupTransmission* for PDSCH,

- The 'CBG transmission information' (CBGTI) field of DCI format 1_1 is of length $N_{TB} \cdot N$ bits, where $N_{TB}$ is the value of the higher layer parameter *maxNrofCodeWordsScheduledByDCI*. If $N_{TB} = 2$ the CBGTI field bits are mapped such that the first set of $N$ bits starting from the MSB corresponds to the first TB while the second set of $N$ bits corresponds to a second TB, if scheduled. The first $M$ bits of each set of $N$ bits in the CBGTI field have an in-order one-to-one mapping with the $M$ CBGs of the TB, with the MSB mapped to CBG#0.

---

139.    The Accused Instrumentalities transmit a maximum limit number of CBGs in a transport block (TB) for the at least one CBG-based communication operation. For example, T-Mobile base stations transmit RRC signaling, including the higher layer parameter

---

[28] *See, e.g.*, TS 38.214 (v. 16.7.0) § 5.1.7.

maxCodeBlockGroupsPerTransportBlock, which reflects the maximum limit number of CBGs in a transport block.[29]

---

### 9.1.1     CBG-based HARQ-ACK codebook determination

If a UE is provided *PDSCH-CodeBlockGroupTransmission* for a serving cell, the UE receives a PDSCH scheduled by DCI format 1_1, that includes code block groups (CBGs) of a transport block. The UE is also provided *maxCodeBlockGroupsPerTransportBlock* indicating a maximum number $N_{\text{HARQ-ACK}}^{\text{CBG/TB max}}$ of CBGs for generating respective HARQ-ACK information bits for a transport block reception for the serving cell.

---

### 5.1.7     Code block group based PDSCH transmission

#### 5.1.7.1     UE procedure for grouping of code blocks to code block groups

If a UE is configured to receive code block group (CBG) based transmissions by receiving the higher layer parameter *codeBlockGroupTransmission* for PDSCH, the UE shall determine the number of CBGs for a transport block reception as

$$M = \min(N, C),$$

where *N* is the maximum number of CBGs per transport block as configured by *maxCodeBlockGroupsPerTransportBlock* for PDSCH, and *C* is the number of code blocks in the transport block according to the procedure defined in Clause 7.2.3 of [5, TS 38.212].

---

140.    The Accused Instrumentalities obtain a size of a CBG field according to the maximum limit number of CBGs. For example, the size of CBG field CBGTI is determined according to maxCodeBlockGroupsPerTransportBlock.[30]

---

### 7.3.1.2.2          Format 1_1

DCI format 1_1 is used for the scheduling of PDSCH in one cell.

[. . .]

CBG transmission information (CBGTI) – 0 bit if higher layer parameter *codeBlockGroupTransmission* for PDSCH is not configured, otherwise, 2, 4, 6, or 8 bits as defined in Clause 5.1.7 of [6, TS38.214], determined by the higher layer parameters *maxCodeBlockGroupsPerTransportBlock* and *maxNrofCodeWordsScheduledByDCI* for the PDSCH.

---

141.    The Accused Instrumentalities transmit the CBG field with the size of the CBG field in a first DL control information (DCI) to the communication device, after obtaining the size of the CBG field, wherein the CBG field indicates at least one transmitted CBG. For example,

---

[29] *See, e.g.*, TS 38.213 (v. 16.7.0) § 9.1.1; TS 38.214 (v. 16.7.0) § 5.1.7.
[30] *See, e.g.*, TS 38.212 (v. 16.7.0) § 7.3.1.2.

T-Mobile base stations transmit the CBG field with the size of the CBG field in the DL control information (DCI) to the UE after obtaining the size of the CBG field.[31]

---

7.3.1.2.2          Format 1_1

DCI format 1_1 is used for the scheduling of PDSCH in one cell.

[. . .]

CBG transmission information (CBGTI) – 0 bit if higher layer parameter *codeBlockGroupTransmission* for PDSCH is not configured, otherwise, 2, 4, 6, or 8 bits as defined in Clause 5.1.7 of [6, TS38.214], determined by the higher layer parameters *maxCodeBlockGroupsPerTransportBlock* and *maxNrofCodeWordsScheduledByDCI* for the PDSCH.

---

6.1.5        Code block group based PUSCH transmission

[. . .]

6.1.5.2          UE procedure for transmitting code block group based transmissions

If a UE is configured to transmit code block group-based transmissions by receiving the higher layer parameter *codeBlockGroupTransmission* in *PUSCH-ServingCellConfig*,

-   For an initial transmission of a TB as indicated by the '*New Data Indicator*' field of the scheduling DCI, the UE may expect that the *CBGTI* field indicates all the CBGs of the TB are to be transmitted, and the UE shall include all the code block groups of the TB.

-   For a retransmission of a TB as indicated by the '*New Data Indicator*' field of the scheduling DCI, the UE shall include only the CBGs indicated by the *CBGTI* field of the scheduling DCI.

A bit value of '0' in the *CBGTI* field indicates that the corresponding CBG is not to be transmitted and '1' indicates that it is to be transmitted. The order of *CBGTI* field bits is such that the CBGs are mapped in order from CBG#0 onwards starting from the MSB.

---

142.    The Accused Instrumentalities perform the at least one CBG-based communication operation with the communication device according to the maximum limit number of CBGs and the CBG field. For example, T-Mobile base stations perform the CBG based communication operation by transmitting the CBGs as part of the transport block and receiving HARQ-ACK feedback from the UE.[32]

---

[31] *See, e.g.*, TS 38.212 (v. 16.7.0) § 7.3.1.2; TS 38.214 (v. 16.7.0) § 6.1.5.
[32] *See, e.g.*, TS 38.214 (v. 16.7.0) § 6.1.5; TS 38.213 (v. 16.7.0) § 9.1.1.

### 6.1.5     Code block group based PUSCH transmission

[. . .]

### 6.1.5.2     UE procedure for transmitting code block group based transmissions

If a UE is configured to transmit code block group-based transmissions by receiving the higher layer parameter *codeBlockGroupTransmission* in *PUSCH-ServingCellConfig*,

-   For an initial transmission of a TB as indicated by the *'New Data Indicator'* field of the scheduling DCI, the UE may expect that the *CBGTI* field indicates all the CBGs of the TB are to be transmitted, and the UE shall include all the code block groups of the TB.

### 9.1.1     CBG-based HARQ-ACK codebook determination

If a UE is provided *PDSCH-CodeBlockGroupTransmission* for a serving cell, the UE receives a PDSCH scheduled by DCI format 1_1, that includes code block groups (CBGs) of a transport block. The UE is also provided *maxCodeBlockGroupsPerTransportBlock* indicating a maximum number $N_{\mathrm{HARQ-ACK}}^{\mathrm{CBG/TB\,max}}$ of CBGs for generating respective HARQ-ACK information bits for a transport block reception for the serving cell.

For a number of $C$ code blocks (CBs) in a transport block, the UE determines a number of CBGs $M$ according to clause 5.1.7.1 of [6, TS 38.214] and determines a number of HARQ-ACK bits for the transport block as $N_{\mathrm{HARQ-ACK}}^{\mathrm{CBG/TB}} = M$ .

[. . .]

The UE generates an ACK for the HARQ-ACK information bit of a CBG if the UE correctly received all code blocks of the CBG and generates a NACK for the HARQ-ACK information bit of a CBG if the UE incorrectly received at least one code block of the CBG. If the UE receives two transport blocks, the UE concatenates the HARQ-ACK information bits for CBGs of the second transport block after the HARQ-ACK information bits for CBGs of the first transport block.

143.     T-Mobile has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, the '053 Patent under 35 U.S.C. § 271(a) by operating, selling, and/or using the Accused Instrumentalities in the United States in accordance with 3GPP Standards at least as early as Release 15, including the 4G/LTE or 5G Standards exemplarily detailed above.

144.     In addition to direct infringement, T-Mobile has indirectly infringed and continues to indirectly infringe the '053 Patent by active inducement in violation of 35 U.S.C. § 271(b), at least by manufacturing, supplying, distributing, selling, and/or offering for sale the Accused Instrumentalities, as well as creating and disseminating promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to those products, with knowledge and the intent that use of those products would constitute direct infringement of the '053 Patent.

145.    For example, T-Mobile actively promotes the advantages of its mobile network despite knowing that its customers use the accused functionality in the Accused Instrumentalities when a device, such as user equipment, communicates with T-Mobile's base stations in accordance with the 4G/LTE or 5G Standards exemplarily detailed above.

146.    T-Mobile has also indirectly infringed and continues to indirectly infringe the '053 Patent in violation of 35 U.S.C. § 271(c) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. T-Mobile knows that its products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '053 Patent and are not staple articles of commerce suitable for substantial noninfringing use.

147.    T-Mobile's acts of infringement have caused and continue to cause damage to Acer, and Acer is entitled to recover from T-Mobile the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '053 Patent, together with interest and costs as fixed by the Court.

148.    T-Mobile has had knowledge and notice of the '053 Patent and its infringement from the time that Acer declared to 3GPP or any of its organizational partners that the '053 Patent was essential to the applicable wireless telecommunication standards such as the 4G/LTE Standards and/or 5G Standards, because T-Mobile is a member of 3GPP and/or its organizational partners.

149.    In addition or in the alternative, T-Mobile has had knowledge and notice of the '053 Patent and its infringement of same due to Acer's efforts to engage T-Mobile in good-faith

negotiations for licenses to Acer's 4G/LTE and 5G relevant SEPs (such as and including the '053 Patent) on fair, reasonable, and non-discriminatory terms.

150.    Further in addition or in the alternative, T-Mobile has had knowledge and notice of the '053 Patent and its infringement of same at least, and through, the filing and service of the Complaint.

151.    Despite this knowledge, T-Mobile continues to commit the infringing acts mentioned above. To the extent acts constituting direct infringement of the '053 Patent are not performed by T-Mobile, such acts constituting direct infringement of the '053 Patent are performed by T-Mobile's customers, end-users, or other parties that act at the direction and/or control of T-Mobile, with T-Mobile's knowledge.

152.    T-Mobile's infringement of the '053 Patent is willful and deliberate, entitling Acer to the recovery of enhanced damages under 35 U.S.C. § 284. T-Mobile has infringed and continues to infringe the '053 Patent despite the risk of infringement being either known or so obvious that it should have been known to T-Mobile.

## COUNT VI: INFRINGEMENT OF THE '641 PATENT

153.    Acer repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

154.    The '641 Patent generally relates to a method of system information transmission and acquisition in a 5G network, particularly 5G New Radio (NR) network supporting standalone and non-standalone cell deployments. '641 Patent at 1:16–67. At the time of invention, system information (SI) of 5G NR mechanisms included essential minimum SI that was fixed-scheduled on a downlink broadcast channel (*e.g.*, physical downlink broadcast channel) and non-essential minimum SI that was dynamically scheduled on a downlink shared channel (*e.g.*, physical downlink share channel), along with other SI broadcast periodically or on-demand. *Id.* at 1:28–39.

However, prior systems lacked capabilities for a mobile device to determine whether it could camp on a NR cell, leading to power consumption and time delay in cell selection. *Id.* at 1:52–61.

155.    The claims of the '641 Patent recite novel and inventive methods for using essential minimum system information with fixed scheduling on a downlink broadcast channel, where the essential minimum SI includes scheduling information (time and frequency resource configuration) and availability information indicating whether the cell broadcasts the non-essential minimum SI for one of the cell, auxiliary cell, or frequency location. The patented inventions overcome technical challenges in 5G networks, including for example, the problem of power consumption and delay when mobile devices are unable to determine whether a cell is campable and cannot reliably acquire minimum SI.

156.    Acer declared the '641 Patent as essential to certain 3GPP Standards, including Release 15 (and later) and its technical specifications, including but not limited to TS 138.300, TS 138.212, TS 138.213, TS 138.331, TS 38.212, TS 38.213, TS 38.300, and TS 38.331, which include inventions covered by the '641 Patent.

157.    T-Mobile has and continues, without authorization, to operate and use the Accused Instrumentalities in a manner that practices at least one claim of the '641 Patent literally or under the doctrine of equivalents. At a minimum, such Accused Instrumentalities include T-Mobile's mobile network, including cellular base stations and related telecommunication equipment configured to operate in accordance with 3GPP Standards at least as early as Release 15.

158.    By way of example, the Accused Instrumentalities infringe at least claim 1 of the '641 Patent, which recites:

> 1. A method of system information transmission for a cell in a wireless communication system, the method comprising:
>
> broadcasting essential minimum system information (SI) of the cell of the wireless communication system with fixed size on a downlink broadcast

channel, wherein the essential minimum SI includes a first scheduling information for non-essential minimum SI of at least one of the cell, an auxiliary cell or a frequency location, and the first scheduling information includes a time and frequency resource configuration and an availability information for indicating whether the cell broadcasts the non-essential minimum SI; and

broadcasting the non-essential minimum SI with dynamically scheduled on a downlink shared channel according to the availability information, such that a mobile device in the wireless communication system is able to obtain the non-essential minimum SI with dynamic scheduled on the downlink shared channel according to the first scheduling information of the essential minimum SI, to determine whether the cell broadcasts remaining parts of the non-essential minimum SI according to a second scheduling information included in the obtained non-essential minimum SI, and to obtain the remaining parts of the non-essential minimum SI according to the second scheduling information;

wherein the availability information is set to a first value for indicating that the cell broadcasts the non-essential minimum SI, and is set to a second value for indicating that the cell does not broadcast the non-essential minimum SI;

wherein the non-essential minimum SI is a minimum SI.

159.    The Accused Instrumentalities perform a method of system information transmission for a cell in a wireless communication system, consistent with the requirements in 3GPP Standards. For example, Release 15's technical specifications provide procedures for the broadcast of system information for a cell in a network.[33]

> # 7       RRC
>
> ## 7.1       Services and Functions
>
> The main services and functions of the RRC sublayer include:
>
> -    Broadcast of System Information related to AS and NAS;

160.    The Accused Instrumentalities broadcast essential minimum system information (SI) of the cell of the wireless communication system with fixed size on a downlink broadcast

---

[33] *See, e.g.*, TS 38.300 (v. 15.5.0) § 7.1.

channel. For example, T-Mobile base stations comprising the Accused Instrumentalities broadcast essential minimum system information (SI) on a downlink broadcast channel (BCH) characterized by a fixed, pre-defined transport format.[34]

## 7.3       System Information Handling

### 7.3.1      Overview

System Information (SI) consists of a MIB and a number of SIBs, which are divided into Minimum SI and Other SI:

- **Minimum SI** comprises basic information required for initial access and information for acquiring any other SI. Minimum SI consists of:

  - *MIB* contains cell barred status information and essential physical layer information of the cell required to receive further system information, e.g. CORESET#0 configuration. *MIB* is periodically broadcast on BCH.

  - *SIB1* defines the scheduling of other system information blocks and contains information required for initial access. SIB1 is also referred to as Remaining Minimum SI (RMSI) and is periodically broadcast on DL-SCH or sent in a dedicated manner on DL-SCH to UEs in RRC_CONNECTED.

---

### 6.2.2      Message definitions
[. . .]
–          *MIB*

The *MIB* includes the system information transmitted on BCH.

Signalling radio bearer: N/A

RLC-SAP: TM

Logical channel: BCCH

Direction: Network to UE

*MIB*

```
-- ASN1START
-- TAG-MIB-START

MIB ::=                          SEQUENCE {
    systemFrameNumber                BIT STRING (SIZE (6)),
    subCarrierSpacingCommon          ENUMERATED {scs15or60, scs30or120},
    ssb-SubcarrierOffset             INTEGER (0..15),
    dmrs-TypeA-Position              ENUMERATED {pos2, pos3},
    pdcch-ConfigSIB1                 PDCCH-ConfigSIB1,
    cellBarred                       ENUMERATED {barred, notBarred},
    intraFreqReselection             ENUMERATED {allowed, notAllowed},
    spare                            BIT STRING (SIZE (1))
}

-- TAG-MIB-STOP
-- ASN1STOP
```

---

[34] *See, e.g.*, TS 38.300 (v. 15.5.0) §§ 5.5, 7.3; TS 38.331 (v. 15.4.0) § 6.2.2; TS 38.212 (v. 15.3.0) § 4.2.

## 5.5 Transport Channels

[. . .]

Downlink transport channel types are:

1. **Broadcast Channel (BCH)** characterised by:

   - fixed, pre-defined transport format;

   - requirement to be broadcast in the entire coverage area of the cell, either as a single message or by beamforming different BCH instances.

## 4.2 Downlink

Table 4.2-1 specifies the mapping of the downlink transport channels to their corresponding physical channels. Table 4.2-2 specifies the mapping of the downlink control channel information to its corresponding physical channel.

### Table 4.2-1

| TrCH | Physical Channel |
|------|-----------------|
| DL-SCH | PDSCH |
| BCH | PBCH |
| PCH | PDSCH |

161.  In the Accused Instrumentalities, the essential minimum SI includes a first scheduling information for non-essential minimum SI of at least one of the cell, an auxiliary cell or a frequency location. For example, T-Mobile base stations broadcast essential minimum SI that includes a first scheduling information for non-essential minimum SI of the cell.[35]

## 5.2 System information

### 5.2.1 Introduction

System Information (SI) is divided into the *MIB* and a number of SIBs where:

- the *MIB* is always transmitted on the BCH with a periodicity of 80 ms and repetitions made within 80 ms (TS 38.212 [17], clause 7.1) and it includes parameters that are needed to acquire *SIB1* from the cell. The first transmission of the MIB is scheduled in subframes as defined in TS 38.213 [13], clause 4.1 and repetitions are scheduled according to the period of SSB;

### 5.2.5.5 Reception of SIB1

The Master Information Block (MIB) on PBCH provides the UE with parameters (e.g. CORESET#0 configuration) for monitoring of PDCCH for scheduling PDSCH that carries the System Information Block 1 (SIB1). PBCH may also indicate that there is no associated SIB1, in which case the UE may be pointed to another frequency from where to search for an SSB that is associated with a SIB1 as well as a frequency range where the UE may assume no SSB associated with SIB1 is present. The indicated frequency range is confined within a contiguous spectrum allocation of the same operator in which SSB is detected.

---

[35] *See, e.g.*, TS 38.331 (v. 15.4.0) § 5.2; TS 38.300 (v. 15.5.0) § 5.2.5.5.

162.    In the Accused Instrumentalities, the first scheduling information includes a time and frequency resource configuration and an availability information for indicating whether the cell broadcasts the non-essential minimum SI. For example, the first scheduling information includes fields for time and frequency resource configuration (pdcch-ConfigSIB1 and controlResourceSetZero) and whether the cell broadcasts non-essential minimum SI (ssb-SubcarrierOffset).[36]

---

**5.2.5.5    Reception of SIB1**

The Master Information Block (MIB) on PBCH provides the UE with parameters (e.g. CORESET#0 configuration) for monitoring of PDCCH for scheduling PDSCH that carries the System Information Block 1 (SIB1). PBCH may also indicate that there is no associated SIB1, in which case the UE may be pointed to another frequency from where to search for an SSB that is associated with a SIB1 as well as a frequency range where the UE may assume no SSB associated with SIB1 is present. The indicated frequency range is confined within a contiguous spectrum allocation of the same operator in which SSB is detected.

---

**6.2.2    Message definitions**

[. . .]

```
MIB ::=                              SEQUENCE {
    systemFrameNumber                    BIT STRING (SIZE (6)),
    subCarrierSpacingCommon              ENUMERATED {scs15or60, scs30or120},
    ssb-SubcarrierOffset                 INTEGER (0..15),
    dmrs-TypeA-Position                  ENUMERATED {pos2, pos3},
    pdcch-ConfigSIB1                     PDCCH-ConfigSIB1,
    cellBarred                           ENUMERATED {barred, notBarred},
```

[. . .]

| MIB field descriptions |
|---|
| *pdcch-ConfigSIB1* |
| See TS 38.213 [13]. Determines a common *ControlResourceSet* (CORESET) a common search space and necessary PDCCH parameters. If the field *ssb-SubcarrierOffset* indicates that *SIB1* is not present, the field *pdcch-ConfigSIB1* indicate the frequency positions where the UE may find SS/PBCH block with *SIB1* or the frequency range where the network does not provide SS/PBCH block with *SIB1* (see TS 38.213 [13], clause 13). |

---

[36] *See, e.g.*, TS 38.300 (v. 15.5.0) § 5.2.5.5; TS 38.331 (v. 15.4.0) § 6.2.2; TS 38.213 (v. 15.13.0) § 13.

# 13      UE procedure for monitoring Type0-PDCCH CSS sets

If during cell search a UE determines from *MIB* that a CORESET for Type0-PDCCH CSS set is present, as described in Clause 4.1, the UE determines a number of consecutive resource blocks and a number of consecutive symbols for the CORESET of the Type0-PDCCH CSS set from *controlResourceSetZero* in *pdcch-ConfigSIB1*, as described in Tables 13-1 through 13-10, and determines PDCCH monitoring occasions from *searchSpaceZero* in *pdcch-ConfigSIB1*, included in *MIB*, as described in Tables 13-11 through 13-15. $SFN_C$ and $n_C$ are the SFN and slot index within a frame of the CORESET based on SCS of the CORESET and $SFN_{SSB,i}$ and $n_{SSB,i}$ are the SFN and slot index based on SCS of the CORESET, respectively, where the SS/PBCH block with index $i$ overlaps in time with system frame $SFN_{SSB,i}$ and slot $n_{SSB,i}$. The symbols of the CORESET associated with *pdcch-ConfigSIB1* in *MIB* or with *searchSpaceSIB1* in *PDCCH-ConfigCommon* have normal cyclic prefix.

**Table 13-1: Set of resource blocks and slot symbols of CORESET for Type0-PDCCH search space set when {SS/PBCH block, PDCCH} SCS is {15, 15} kHz for frequency bands with minimum channel bandwidth 5 MHz or 10 MHz**

frequency and time resource configuration

| Index | SS/PBCH block and CORESET multiplexing pattern | Number of RBs $N_{RB}^{CORESET}$ | Number of Symbols $N_{symb}^{CORESET}$ | Offset (RBs) |
|-------|-----------------------------------------------|----------------------------------|----------------------------------------|--------------|
| 0 | 1 | 24 | 2 | 0 |
| 1 | 1 | 24 | 2 | 2 |
| 2 | 1 | 24 | 2 | 4 |
| 3 | 1 | 24 | 3 | 0 |
| 4 | 1 | 24 | 3 | 2 |
| 5 | 1 | 24 | 3 | 4 |
| 6 | 1 | 48 | 1 | 12 |
| 7 | 1 | 48 | 1 | 16 |
| 8 | 1 | 48 | 2 | 12 |
| 9 | 1 | 48 | 2 | 16 |
| 10 | 1 | 48 | 3 | 12 |
| 11 | 1 | 48 | 3 | 16 |
| 12 | 1 | 96 | 1 | 38 |
| 13 | 1 | 96 | 2 | 38 |
| 14 | 1 | 96 | 3 | 38 |
| 15 | Reserved | | | |

163.    The Accused Instrumentalities broadcast the non-essential minimum SI with dynamically scheduled on a downlink shared channel according to the availability information, such that a mobile device in the wireless communication system is able to obtain the non-essential minimum SI with dynamic scheduled on the downlink shared channel according to the first scheduling information of the essential minimum SI. For example, SIB1 is dynamically scheduled on a Downlink Shared Channel (DL-SCH), such that a mobile device (UE) is able to obtain the

non-essential minimum SI with dynamic scheduled on the downlink channel according to the first scheduling information of the essential minimum SI.[37]

---

**5.2.5.5    Reception of SIB1**

The Master Information Block (MIB) on PBCH provides the UE with parameters (e.g. CORESET#0 configuration) for monitoring of PDCCH for scheduling PDSCH that carries the System Information Block 1 (SIB1). PBCH may also

---

# 7.3    System Information Handling

## 7.3.1    Overview

System Information (SI) consists of a MIB and a number of SIBs, which are divided into Minimum SI and Other SI:

- **Minimum SI** comprises basic information required for initial access and information for acquiring any other SI. Minimum SI consists of:

  - *MIB* contains cell barred status information and essential physical layer information of the cell required to receive further system information, e.g. CORESET#0 configuration. *MIB* is periodically broadcast on BCH.

  - *SIB1* defines the scheduling of other system information blocks and contains information required for initial access. SIB1 is also referred to as Remaining Minimum SI (RMSI) and is periodically broadcast on DL-SCH or sent in a dedicated manner on DL-SCH to UEs in RRC_CONNECTED.

---

## 7.3.2    Scheduling

The MIB is mapped on the BCCH and carried on BCH while all other SI messages are mapped on the BCCH, where they are dynamically carried on DL-SCH. The scheduling of SI messages part of Other SI is indicated by *SIB1*.

---

164.    The Accused Instrumentalities determine whether the cell broadcasts remaining parts of the non-essential minimum SI according to a second scheduling information included in the obtained non-essential minimum SI, and obtain the remaining parts of the non-essential minimum SI according to the second scheduling information. For example, SIB1 includes a second scheduling information, comprising SI-SchedulingInfo regarding broadcast status and scheduling for the remaining parts of the non-essential minimum SI.[38]

---

[37] *See, e.g.*, TS 38.300 (v. 15.5.0) §§ 5.2.5, 7.3.

[38] *See, e.g.*, TS 38.300 (v. 15.5.0) § 7.3; TS 38.331 (v. 15.4.0) §§ 5.2, 6.3.

## 7.3     System Information Handling

### 7.3.1     Overview

[. . .]

- *SIB1* defines the scheduling of other system information blocks and contains information required for initial access. SIB1 is also referred to as Remaining Minimum SI (RMSI) and is periodically broadcast on DL-SCH or sent in a dedicated manner on DL-SCH to UEs in RRC_CONNECTED.

## 5.2     System information

### 5.2.1     Introduction

[. . .]

- the *SIB1* is transmitted on the DL-SCH with a periodicity of 160ms and variable transmission repetition periodicity as specified in TS 38.213 [13, Section 13]. The default transmission repetition periodicity of *SIB1* is 20ms but the actual transmission repetition periodicity is up to network implementation. For SSB and CORESET multiplexing pattern 1, *SIB1* repetition transmission period is 20ms. For SSB and CORESET multiplexing pattern 2/3, *SIB1* transmission repetition period is the same as the SSB period [13]. SIB1 includes information regarding the availability and scheduling (e.g. mapping of SIBs to SI message, periodicity, SI-window size) of other SIBs with an indication whether one or more SIBs are only provided on-demand and, in that case, the configuration needed by the UE to perform the SI request. SIB1 is cell-specific SIB;

## 6.3.2     Radio resource control information elements

[. . .]

–     *SI-SchedulingInfo*

The IE *SI-SchedulingInfo* contains information needed for acquisition of SI messages.

**SI-SchedulingInfo information element**

[. . .]

```
SchedulingInfo ::=                    SEQUENCE {
    si-BroadcastStatus                    ENUMERATED {broadcasting, notBroadcasting},
```

[. . .]

| SchedulingInfo field descriptions |
|---|
| **si-BroadcastStatus** |
| Indicates if the SI message is being broadcasted or not. Change of *si-BroadcastStatus* should not result in system information change notifications in Short Message transmitted with P-RNTI over DCI (see section 6.5). The value of the indication is valid until the end of the BCCH modification period when set to broadcasting. |

165.     In the Accused Instrumentalities, the availability information is set to a first value for indicating that the cell broadcasts the non-essential minimum SI, and is set to a second value for indicating that the cell does not broadcast the non-essential minimum SI. For example, the MIB field ssb-SubcarrierOffset can indicate that the cell broadcasts SIB1, or that a cell does not broadcast SIB1.[39]

---

[39] *See, e.g.*, TS 38.331 (v. 15.4.0) § 6.2.2; TS 38.213 (v. 15.13.0) § 4.1.

---

**6.2.2    Message definitions**

[. . .]

−          *MIB*

[. . .]

```
MIB ::=                          SEQUENCE {
    systemFrameNumber               BIT STRING (SIZE (6)),
    subCarrierSpacingCommon         ENUMERATED {scs15or60, scs30or120},
    ssb-SubcarrierOffset            INTEGER (0..15),
```
[. . .]

| *MIB field descriptions* |
| --- |
| *ssb-SubcarrierOffset* <br> Corresponds to k$_{SSB}$ (see TS 38.213 [13]), which is the frequency domain offset between SSB and the overall resource block grid in number of subcarriers. (See TS 38.211 [16], clause 7.4.3.1). <br> The value range of this field may be extended by an additional most significant bit encoded within PBCH as specified in TS 38.213 [13]. <br> This field may indicate that this cell does not provide *SIB1* and that there is hence no CORESET#0 configured in MIB (see TS 38.213 [13], clause 13). In this case, the field *pdcch-ConfigSIB1* may indicate the frequency positions where the UE may (not) find a SS/PBCH with a control resource set and search space for SIB1 (see TS 38.213 [13], clause 13). |

---

# 4    Synchronization procedures

## 4.1    Cell search

[. . .]

Upon detection of a SS/PBCH block, the UE determines from *MIB* that a CORESET for Type0-PDCCH CSS set, as described in clause 13, is present if $k_{SSB} < 24$ [4, TS 38.211] for FR1 or if $k_{SSB} < 12$ for FR2. The UE determines from *MIB* that a CORESET for Type0-PDCCH CSS set is not present if $k_{SSB} > 23$ for FR1 or if $k_{SSB} > 11$ for FR2; the CORESET for Type0-PDCCH CSS set may be provided by *PDCCH-ConfigCommon*.

166.    In the Accused Instrumentalities, the non-essential minimum SI is a minimum SI. For example, T-Mobile base stations broadcast non-essential minimum SI that is a minimum SI.[40]

---

# 7.3    System Information Handling

## 7.3.1    Overview

System Information (SI) is divided into Minimum SI and Other SI, where Minimum SI is transmitted over two different downlink channels using different messages (*MIB* and *SIB1*) and Other SI is transmitted in *SystemInformation* messages (*SIB2* and above):

---

167.    T-Mobile has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, the '641 Patent under 35 U.S.C. § 271(a) by operating, selling, and/or using the Accused Instrumentalities in the United States in accordance with 3GPP Standards at least as early as Release 15, including the 4G/LTE or 5G Standards exemplarily detailed above.

---

[40] *See, e.g.*, TS 38.300 (v. 15.3.0) § 7.3.

168.    In addition to direct infringement, T-Mobile has indirectly infringed and continues to indirectly infringe the '641 Patent by active inducement in violation of 35 U.S.C. § 271(b), at least by manufacturing, supplying, distributing, selling, and/or offering for sale the Accused Instrumentalities, as well as creating and disseminating promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to those products, with knowledge and the intent that use of those products would constitute direct infringement of the '641 Patent.

169.    For example, T-Mobile actively promotes the advantages of its mobile network despite knowing that its customers use the accused functionality in the Accused Instrumentalities when a device, such as user equipment, communicates with T-Mobile's base stations in accordance with the 4G/LTE or 5G Standards exemplarily detailed above.

170.    T-Mobile has also indirectly infringed and continues to indirectly infringe the '641 Patent in violation of 35 U.S.C. § 271(c) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. T-Mobile knows that its products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '641 Patent and are not staple articles of commerce suitable for substantial noninfringing use.

171.    T-Mobile's acts of infringement have caused and continue to cause damage to Acer, and Acer is entitled to recover from T-Mobile the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '641 Patent, together with interest and costs as fixed by the Court.

172.    T-Mobile has had knowledge and notice of the '641 Patent and its infringement from the time that Acer declared to 3GPP or any of its organizational partners that the '641 Patent was essential to the applicable wireless telecommunication standards such as the 4G/LTE Standards and/or 5G Standards, because T-Mobile is a member of 3GPP and/or its organizational partners.

173.    In addition or in the alternative, T-Mobile has had knowledge and notice of the '641 Patent and its infringement of same due to Acer's efforts to engage T-Mobile in good-faith negotiations for licenses to Acer's 4G/LTE and 5G relevant SEPs (such as and including the '641 Patent) on fair, reasonable, and non-discriminatory terms.

174.    Further in addition or in the alternative, T-Mobile has had knowledge and notice of the '641 Patent and its infringement of same at least, and through, the filing and service of the Complaint.

175.    Despite this knowledge, T-Mobile continues to commit the infringing acts mentioned above. To the extent acts constituting direct infringement of the '641 Patent are not performed by T-Mobile, such acts constituting direct infringement of the '641 Patent are performed by T-Mobile's customers, end-users, or other parties that act at the direction and/or control of T-Mobile, with T-Mobile's knowledge.

176.    T-Mobile's infringement of the '641 Patent is willful and deliberate, entitling Acer to the recovery of enhanced damages under 35 U.S.C. § 284. T-Mobile has infringed and continues to infringe the '641 Patent despite the risk of infringement being either known or so obvious that it should have been known to T-Mobile.

## JURY DEMAND

177.    Acer hereby demands a trial by jury on all issues.

**FEES AND COSTS**

178.    To the extent that T-Mobile's willful and deliberate infringement and/or litigation conduct supports a finding that this is an "exceptional case," an award of attorneys' fees and costs to Acer is justified under 35 U.S.C. § 285.

**PRAYER FOR RELIEF**

WHEREFORE, Acer prays for entry of judgment as follows:

a.    A judgment in favor of Acer that T-Mobile has infringed, directly and/or indirectly, and is infringing, either literally and/or under the doctrine of equivalents, the Asserted Patents;

b.    A judgment in favor of Acer that T-Mobile's infringement has been and continues to be willful; in the alternative, a judgment in favor of Acer that T-Mobile's infringement is willful and continues to be willful as of the date of this Complaint;

c.    An award of damages in favor of Acer adequate to compensate Acer for T-Mobile's infringement of the Asserted Patents which shall in no event be less than a reasonable royalty, together with interest and costs as fixed by the court pursuant to 35 U.S.C. § 284;

d.    An award of an ongoing royalty for T-Mobile's post-judgment infringement;

e.    An award of costs and expenses as deemed appropriate by the Court; and

f.    Any other legal or equitable relief to which Acer is justly entitled.

Dated: January 9, 2026

Respectfully submitted,

/s/ Warren J. McCarty, III

Warren J. McCarty, III
State Bar No. 24107857
wmccarty@azalaw.com
**AHMAD, ZAVITSANOS & MENSING, PLLC**
2001 Ross Ave., Suite 520
Dallas, Texas 75201
(214) 800-4501

Jason McManis
State Bar No. 24088032
jmcmanis@azalaw.com
Weining Bai
State Bar No.: 24101477
wbai@azalaw.com
Louis Liao
State Bar No.: 24109471
lliao@azalaw.com
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101

***Attorneys for Plaintiff***
**Acer, Inc.**